LA NINFA.

WHITELAW v. UNITED STATES.

(Circuit Court of Appeals, Ninth Circuit. June 29, 1896.)

No. 24.

1. ALASKAN SEAL FISHERIES—JURISDICTION OF UNITED STATES IN BEHRING SEA—AWARD OF ARBITRATORS.

By the award of the arbitrators under the treaty of arbitration between the United States and Great Britain (27 Stat. 948) it was settled that the United States have no exclusive jurisdiction in the waters of Behring Sea outside the ordinary three-mile limit, and no right of property in, or protection over, the fur seals frequenting the islands of the United States when found outside of such three-mile limit. Therefore the act of March 2, 1889, declaring that Rev. St. § 1956, which forbids the killing of fur-bearing animals in Alaska and the waters thereof, shall apply to "all the dominion of the United States in the waters of Behring Sea," must be construed to mean the waters within three miles of the shores of Alaska.

2. SAME—RIGHTS OF CITIZENS OF UNITED STATES.

As by the terms of the treaty of arbitration "the rights of the citizens and subjects of either country" were involved in the decision of the arbitrators, citizens of the United States have the same right to rely upon the award, as to their rights, under the statute, as the citizens and subjects of Great Britain.

3. TREATIES OF ARBITRATION—CONCLUSIVENESS OF AWARD.

An award by arbitrators under a treaty between the United States and another nation, by which the contracting nations agree that the decision of the tribunal of arbitration shall be a final settlement of all questions submitted, becomes the supreme law of the land, and is as binding on the courts as an act of congress. 49 Fed. 575, reversed.

McKenna, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the District of Alaska.

Page & Eells, for appellant.

Chas. A. Garter, for the United States.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge. This is an appeal in admiralty from a decree of the district court for the district of Alaska, forfeiting the schooner La Ninfa, upon the ground that she had been unlawfully engaged in killing seal in the waters of Alaska territory. See 49 Fed. 575. The libel charges that the vessel and her crew "were engaged in killing fur seals within the limits of Alaska territory, and in the waters thereof, in violation of section 1956 of the Revised Statutes of the United States, and of other acts of congress, and of the proclamation issued by the president thereunder." The district court found that "on the 6th day of July, 1891, and theretofore, the master and crew of defendant vessel were engaged in killing, and did kill, fur seal in that portion of Behring Sea ceded by Russia to the United States by treaty of 1867, and within the waters of Alaska, in violation of section 1956 of the Revised Statutes of the United States, and of the other acts of congress and the proclamation

of the president of the United States thereunder," and that the vessel was an American vessel. The court thereupon decreed a forfeiture of the vessel, and of the skins on board of her. It appears from the facts shown by the record that the schooner was fitted out at San Francisco, Cal., "on a whaling, walrusing, hunting, and fishing voyage to the North Pacific and Arctic Oceans"; that fur sealing was among the objects contemplated by the voyage; that she sailed from San Francisco April 1, 1891; that on the 3d day of July she passed into Behring Sea; that on the 6th day of July she put out her boats for the first time in that sea, and brought in 14 skins; that on the next day the United States ship Thetis notified the captain of the schooner "that the sea was closed from sealing." Ensign Dodd of the Thetis boarded the schooner on July 7th, about 30 miles off St. Paul's island, under orders which required his cutter "to board all vessels in the Behring Sea, and, if they were engaged in sealing, to give them a copy of the president's proclamation, and a letter of warning to leave at once." The captain of the schooner informed the officer that he had 19 skins on board, some of which he had killed in Behring Sea. The officer testified:

"As near as I can remember, I asked him if he had killed any seal in the sea, and if he had been warned before, and. learning that he had not, I gave him a copy of the warning, asked for the ship's papers, and indorsed them. * * * Captain Worth said he was fitted out for whaling, and asked me if he could whale in the Behring Sea. * * * I replied that some arrangements might be made to that effect, but that I had no authority to make them; that I had warned him by serving these papers; and that, if he remained, it was at his own risk of being seized."

The captain and officers of the schooner testified that they did not seal after they got this warning, but did whale, and were on good whaling grounds at the time of the seizure. The proclamation of the president was made June 15, 1891, pursuant to agreement with the British government, known as the "Modus Vivendi." On the 14th of July the schooner was again boarded by the officer of the Corwin, who seized her for a violation of the proclamation, and took her to Sitka for condemnation. The Corwin found the schooner about eight miles from St Paul's island. She had on board 19 seal-skins, of which number Capt. Worth said 5 had not been killed in the sea. There is no evidence that a single seal had been killed within one marine league of Alaska, whether of the mainland or any of its islands. The evidence does show that the killing of the seals was about 10 miles from shore.

From these facts the question arises whether Behring Sea, at a distance of more than one league from the American shore, is Alaskan territory, or in the waters thereof, or within the dominion of the United States in the waters of Behring Sea. Section 1956 of the Revised Statutes reads as follows:

"Sec. 1956. No person shall kill any otter, mink, marten or fur-seal, or other fur-bearing animal, within the limits of Alaska territory, or in the waters thereof; * * * and all vessels, their tackle, apparel, furniture and cargo, found engaged in violation of this section shall be forfeited," etc.

Section 3 of the act to provide for the protection of the salmon fisheries of Alaska, approved March 2, 1889, provides that section

1956 "is hereby declared to include and apply to all the dominion of the United States in the waters of Behring Sea; and it shall be the duty of the president, at a timely season in each year, to issue his proclamation and cause the same to be published * * * warning all persons against entering said waters for the purpose of violating the provisions of said section," etc. By these provisions, the question as to what the boundaries were over which the United States had dominion was not intended to be, and was not, determined by the amendatory act. The question was left open for future consideration. By reference to the proceedings in congress, it appears that the amendment to section 1956 was brought about in the following manner: A bill was introduced in the senate, and passed, amending section 1963 of the Revised Statutes, and to provide for better protection of the fur seal and salmon fisheries in Alaska, and had reference to fishing and fisheries only. When this bill came to the house of representatives, an amendment was proposed and adopted, "that section 1956 of the Revised Statutes was intended to include and apply, and is hereby decreed to include and apply, to all the waters of Behring Sea in Alaska embraced within the boundary lines mentioned and described in the treaty with Russia, dated March 30, 1867, by which the territory of Alaska was ceded to the United States," etc. The bill, as thus amended, was returned to the senate. The committee on foreign relations reported the house amendment with a recommendation that it be disagreed to. Senator Morgan, of the committee, said:

"That in the report made by the committee the rights of the government of the United States were not considered, and not intended to be considered. We only arrive at the conclusion that the question presented in the amendment of the house is of such a serious and important character that the committee on foreign relations would not undertake, at this time, to pronounce that kind of judgment upon it which is due to the magnitude of such a question. * * * The bill, as it passed the senate originally, should pass, because it protects the salmon and other fisheries in Alaska, about which there is no dispute. But this particular question is one of very great gravity and seriousness, and the committee on foreign relations, or at least a majority of the entire committee, did not feel warranted in undertaking to consider it at this time."

Senator Sherman, of the same committee, said:

"The question proposed by the house to the form of an amendment was a grave one, and had no relation to the subject-matter of the bill, and ought not to be connected with it,—had no connection really with it,—and involved serious matters of international law, perhaps, and of public policy, and therefore it ought to be considered by itself."

The amendment made by the house was disagreed to. A committee of conference was appointed. The result was that the description as to the boundaries in the house amendment was stricken out, and the words "hereby declared to include and apply to all the dominions of the United States in the waters of Behring Sea" inserted in lieu thereof. It thus appears, as is manifest by the act itself, that the question as to the boundaries over which the United States had dominion was not intended to be, and was not, determined when the act was passed.

The government relies solely upon the provisions of the statute to sustain the decree of the district court, and contends that the decision of the supreme court, in Re Cooper, 143 U. S. 474, 12 Sup. Ct. 453, justifies the affirmance of the decree. That decision does not reach the direct point here in controversy. The court there held that the question was a political one, in which the United States had asserted a doctrine in opposition to the views contended for by the petitioner; that the negotiations were then pending in relation to the particular subject; but the court declined to decide whether the government was right or wrong in its contention, or to review the action of the political departments upon the question under review. The opinion shows that the court considered it a grave question. It recites much of the important history relative to the disputed question, but the question itself was not decided. The case was disposed of upon other grounds. What was said concerning the disputed questions had reference to the conditions then existing. The conditions now existing are entirely different. The negotiations then pending were brought about by the asserted claim of the United States to proprietary rights in the waters of Behring Sea, and in the fur-bearing animals which frequent it and its islands, which was disputed by other nations, particularly by England, the property of whose subjects had been from time to time seized by the United States for alleged violations of the statutes in question; and these controversies resulted in submitting the disputed question to an arbitration. 27 Stat. 948. Article 1 provides that:

"The questions which have arisen between the government of the United States and the government of her Britannic majesty, concerning the jurisdictional rights of the United States in the waters of Behring's Sea, and concerning also the preservation of the fur-seal in, or habitually resorting to the said sea, and the rights of the citizens and subjects of either country, as regards the taking of fur-seal in, or habitually resorting to the said waters, shall be submitted to a tribunal of arbitration."

The five points submitted to the arbitrators are set forth in article 6, and, omitting the second, are as follows:

"(1) What exclusive jurisdiction in the sea, now known as the Behring's Sea, and what exclusive rights in the seal fisheries therein, did Russia assert and exercise prior and up to the time of the cession of Alaska to the United States? * * *"

"(3) Was the body of water now known as the Behring's Sea included in the phrase 'Pacific Ocean,' as used in the treaty of 1825 between Great Britain and Russia; and what rights, if any, in the Behring's Sea were held and exclusively exercised by Russia after said treaty?

"(4) Did not all the rights of Russia as to jurisdiction, and as to the seal fisheries in Behring's Sea east of the water boundary in the treaty between the United States and Russia of the 30th March, 1867, pass unimpaired to the United States under that treaty?

"(5) Has the United States any right, and, if so, what right of protection or property in the fur-seals frequenting the islands of the United States in Behring Sea, when such seals are found outside the ordinary three-mile limit?"

The decision of the arbitrators upon these points was as follows:

"(1) * * * By the ukase of 1821, Russia claimed jurisdiction in the sea now known as the 'Behring Sea' to the extent of one hundred Italian miles from the coasts and islands belonging to her; but in the course of the

negotiations which led to the conclusion of the treaties of 1824 with the United States, and of 1825 with Great Britain, Russia admitted that her jurisdiction in the said sea should be restricted to the reach of cannon shot from the shore; and it appears that from that time up to the time of the cession of Alaska to the United States, Russia never asserted in fact or exercised any exclusive jurisdiction in Behring's Sea, or any exclusive rights in the seal fisheries therein, beyond the ordinary limit of territorial waters. * * *

"(2) * * * * * * * * * * * *

"(3) As to the third of the said five points, as to so much thereof as requires us to decide whether the body of water now known as 'Behring Sea' was included in the phrase 'Pacific Ocean,' as used in the treaty of 1825 between Great Britain and Russia, we, the said arbitrators, do unanimously decide and determine that the body of water now known as the 'Behring Sea' was included in the phrase 'Pacific Ocean,' as used in the said treaty. And as to so much of said third point as requires us to decide what rights, if any, in the Behring Sea were held and exclusively exercised by Russia after the said treaty of 1825, we, * * * a majority of said arbitrators, do decide and determine that no exclusive rights of jurisdiction in Behring Sea, and no exclusive rights as to the seal fisheries therein, were held or exercisd by Russia outside of the ordinary territorial waters after the treaty of 1825. As to the fourth of said five points, we, the said arbitrators, do unanimously decide and determine that all the rights of Russia as to jurisdiction and as to the seal fisheries in the Behring Sea east of the water boundary, in the treaty between the United States and Russia of 30th March, 1867, did pass unimpaired to the United States under the said treaty. As to the fifth of said points * * * a majority of the said arbitrators do decide and determine that the United States has not any right of protection or property in the fur-seals frequenting the islands of the United States in Behring Sea, when such seals are found outside the ordinary three-mile limit."

27 Am. Law Rev. 703.

By the fourteenth article of the treaty or convention submitting the questions to arbitration it was provided that:

"The high contracting parties engage to consider the result of the proceedings of the tribunal of arbitration as a full, perfect and final settlement of all the questions referred to by the arbitrators."

In submitting the questions to the high court of arbitration, the government agreed to be bound by the decision of the arbitrators, and has since passed an act to give effect to the award rendered by the tribunal of arbitration. 28 Stat. 52. The award should, therefore, be considered as having finally settled the rights of the United States in the waters of Alaska and of Behring Sea, and all questions concerning the rights of its own citizens and subjects therein, as well as of the citizens and subjects of other countries.

The true interpretation of section 1956, and of the amendment thereto, depends upon the dominion of the United States in the waters of Behring Sea,—such dominion therein as was "ceded by Russia to the United States by treaty of 1867." This question has been settled by the award of the arbitrators, and this settlement must be accepted "as final." It follows therefrom that the words "in the waters thereof," as used in section 1956, and the words "dominion of the United States in the waters of Behring Sea," in the amendment thereto, must be construed to mean the waters within three miles from the shores of Alaska. On coming to this conclusion, this court does not decide the question adversely to the political department of the government. It is undoubtedly true, as has been decided by the

supreme court, that in pending controversies doubtful questions, which are undecided, must be met by the political department of the government. "They are beyond the sphere of judicial cognizance," and, "if a wrong has been done, the power of redress is with congress, not with the judiciary." The Cherokee Tobacco, 11 Wall. 616–621. But in the present case there is no pending question left undetermined for the political department to decide. It has been settled. The award is to be construed as a treaty which has become final. A treaty, when accepted and agreed to, becomes the supreme law of the land. It binds courts as much as an act of congress. In Head Money Cases, 112 U. S. 580–598, 5 Sup. Ct. 254, the court said:

"A treaty is primarily a contract between independent nations. It depends for the enforcement of its provisions on the interest and honor of the governments which are parties to it. * * * A treaty, then, is the law of the land, as an act of congress is, whenever its provisions prescribe a rule by which the rights of the private citizen or subject may be determined. And when such rights are of a nature to be enforced in a court of justice, that court resorts to the treaty for a rule of decision for the case before it, as it would to a statute." Chew Heong v. U. S., 112 U. S. 536, 540, 565, 5 Sup. Ct. 255; U. S. v. Rauscher, 119 U. S. 407–419, 7 Sup. Ct. 234.

The duty of courts is to construe and give effect to the latest expression of the sovereign will; hence it follows that, whatever may have been the contention of the government at the time In re Cooper was decided, it has receded therefrom since the award was rendered by an agreement to accept the same "as a full, complete, and final settlement of all questions referred to by the arbitrators," and from the further fact that the government since the rendition of the award has passed "an act to give effect to the award rendered by the tribunal of arbitration."

It is suggested in the brief of the learned counsel for the United States that:

"It may be the present policy of the government to make record evidence as to the consistency of its contentions from the beginning upon the important question of its rights to protect its property and seal fisheries. * * * It may be that it is the policy of this government to punish its own citizens and vessels, and not the citizens and vessels of England. All these and other considerations make the question one essentially political, so that courts would at least hesitate to enter any field beyond that of construing the statutes under which this case is presented."

There is nothing in the award which denies jurisdiction of the United States over her own merchant vessels on the high seas at any place not within the jurisdiction of any other sovereignty. These questions have no bearing as to the interpretation to be given to the statutes under review. These statutes, whatever their interpretation may be, must be applied to citizens and subjects of all nations, and were not intended to apply only to citizens, subjects, and vessels of America. By the terms of the arbitration, "the rights of the citizens and subjects of either country" were involved in the decision of the arbitrators, and it necessarily follows that the citizens and subjects of the United States have the same right to rely upon the award as to their rights, under the statute, as the citizens and subjects of England. There are no provisions in the act of April 6,

1894, "to give effect to the award rendered by the tribunal of arbitration," which indicate any policy upon the part of this government to enforce any rights against its own citizens, under the statute, consistent with the contentions made, "from the beginning upon the important questions of its right to protect its property and seal fisheries." On the other hand, the entire act clearly shows that it is the policy of the government not to make any such distinction. The act was passed enacting certain rules relative to the control of its own subjects in the exercise of the right which, under the award of the arbitrators, the two countries had in common to kill seal outside of the three-mile limit.

The decree of the district court is reversed, and the cause remanded, with instructions to the district court to dismiss the libel.

McKENNA, Circuit Judge, dissents.