## THE TENYU MARU.

(Third Division.   Valdez.   June 30, 1910.)

No. 399A.

FISH (§ 16*)—SEAL FISHERIES—ADMIRALTY—FORFEITURES. ·
    A Japanese sealing schooner stood 11½ miles off the Pribilof
seal islands, and sent her boats out hunting seals; the boats
went inside the three-mile limit of the shores of the seal is-
lands and killed female fur seals; the schooner and boats were
captured, and the schooner was libeled in the United States
courts in Alaska for violation of the law in killing female
seals within the jurisdiction of the court.   Held, the schooner
was "engaged in" killing seals within the three-mile limit when
she sent her boats within the limit for that purpose, and was
subject to forfeiture to the United States with her tackle, ap-
parel, furniture, and cargo, which latter consisted of fur seal-
skins.

    [Ed. Note.—For other cases, see Fish, Cent. Dig. § 31;  Dec.
Dig. § 16.*]

This is a libel against the Japanese schooner the Tenyu
Maru, her tackle, apparel, furniture, and cargo, charging the
vessel, her captain, officers, and crew with illegal sealing with-
in the three-mile limit of the shores of the Pribilof Islands,
in the waters adjacent thereto, in the Third judicial division
of the territory of Alaska.

The revenue cutter Perry, under command of Capt. Haeke,
while under orders from the secretary of the treasury patroling
the waters of Bering Sea in and about the Pribilof Islands
within the territory of Alaska on the morning of the 9th of
July, 1909, discovered two boats within about a mile and a
half of the shores of Otter Island.   The cutter proceeded to
capture these boats, the first taken when 2.6 miles from shore
and the other after crossing the three-mile line.   In the first
boat were three Japanese, one dead seal, and the usual par-
aphernalia employed in seal hunting, including guns, ammuni-
tion, and compass.   The crew of these small boats then di-
rected the officers of the revenue cutter to the schooner to
which they belonged, which proved to be the Tenyu Maru,

lying off from shore about 11½ miles or 8½ miles beyond the territorial three-mile limit.

After boarding the schooner with the two small boats and their crews, the revenue cutter Perry remained in the same locality for about 24 hours or until the following day at noon, July 10th; two small boats manned by the schooner's crew returning in the meantime. The captain of the schooner having informed the revenue cutter officials that eight of his boats, manned by the crew of the Tenyu Maru, had departed from the schooner early on the morning of July 9th, and but four had returned.

The Tenyu Maru with her captain and crew, with the exception of those not returning, were conveyed by the cutter to Dutch Harbor, Unalaska, territory of Alaska, within the Third judicial division, and the schooner there placed in charge of the deputy United States marshal and the captain and his crew brought to Valdez, Alaska, to attend the fall term of this court.

The captain and his crew were indicted by the grand jury, and upon trial the three men captured in the small boat within the three-mile limit were found guilty and sentenced to a term in the federal jail; the others were acquitted and discharged.

While the schooner was in the custody of the deputy United States marshall at Unalaska, within the Third judicial division of Alaska, she was libeled by the United States; the usual monition issued from this court in October, 1909, and subsequently after the criminal trial, upon motion of the United States District Attorney, an amendment of the original libel was allowed, setting up in the sixth paragraph the indictment, trial, conviction, and sentence in the criminal case above referred to, to which amended libel the owner and claimant, a Japanese company, by its proctor, filed exceptions alleging lack of jurisdiction in this court appearing on the face of the libel in that the libel alleged the schooner to have been captured without the three-mile limit, or 11½ miles from shore. Upon the exceptions being overruled, an answer was filed denying that the said schooner or her crew killed the seal alleged in the libel or any seal within the territorial limits of Alaska, and denying jurisdiction in this court to hold, condemn, and forfeit

the said schooner admittedly captured 11½ miles from the Alaskan shores and without the three-mile limit.

The case came on for hearing before this court in admiralty on April 30th, at which time, in accordance with a stipulation theretofore entered into and signed by the respective proctors and filed in this court, the transcript of the evidence given in the criminal cause was presented to the court; there being no oral testimony presented by either side at the hearing, and the only other evidence offered being the indictment, verdict, instructions of the court to the jury, judgment and sentence in the criminal case, together with the exhibits therein admitted.

C. D. Murane, Dist. Atty., of Nome, for the United States.
E. E. Ritchie, of Valdez, for respondent.

OVERFIELD, District Judge. This case presents a new question with respect to the right of the United States to protect the fur seals within the territory of Alaska: First, as to the limits and extent of the jurisdiction of a United States court on the waters adjacent and surrounding the Pribilof Islands in the Bering Sea in enforcing a violation of the statutes above referred to as against citizens and subjects of Japan; and, second, can a schooner belonging to a Japanese company, sailing under the flag and license of the Mikado, be libeled and forfeited to the United States under the statutes above mentioned, in the event one or more of her small boats are captured within the three-mile limit, illegally sealing, but the schooner is found without the said prohibited zone?

To the first question we find numerous adjudicated cases arising under the same statutes here in question and connected with the United States revenue cutters capturing boats and crews alleged to have been found illegally sealing within the territorial waters of Alaska; but in no case, so far as I am aware, have similar facts been before a court wherein a foreign vessel has been captured at a distance more than the marine league from the American shores and libeled for violation of a statute of the United States, committed by or through its small boats within the said limit.

A case arose under the same statutes here in question in the waters surrounding and adjacent to the Pribilof Islands, in United States v. Jane Gray (D. C.) 77 Fed. 908, but the vessel there condemned and forfeited was an American licensed schooner. The trial court found the evidence conflicting as to whether the vessel itself was within the marine league when captured or had been, but said Judge Morrow:

"Nor would it make any difference in law whether, at the time of the killing, the schooner were just outside the prohibited area while her boats were inside. If the boats were alone inside, and killed seals therein, the schooner, her tackle, apparel, furniture, and cargo are, in law, just as much subject to condemnation and forfeiture. Otherwise it would result that the statute would prove impractical in its operation, and the protection to fur seals a delusion."

This decision, among others, seems to admit the jurisdiction might be extraterritorial with reference to the enforcement of a violation of sections 173 and 178, Pen. Code, in the waters of Bering Sea in Alaska, against an American vessel, where the violation took place within three miles of the shores of the island belonging to the United States in Bering Sea. The United States has so well defined its position as to its territorial jurisdiction over the waters of Bering Sea within the territory of Alaska, concerning the protection of fur seals and fisheries, that a short review will, I think, be not inappropriate.

When the act of March 2, 1889 (25 Stat. 1009, c. 415) amendatory of section 1956, was before Congress and still in committee, an amendment to the proposed amendatory act was drafted by the House Committee to have the said act with relation to salmon fisheries to include and apply to all waters of Bering Sea in Alaska, embraced within the boundary lines mentioned and described in the treaty with Russia March 30, 1867 (15 Stat. 539), by which treaty Alaska became the property of the United States. The committee on foreign affairs, however, reported the said proposed amendment, but with a recommendation that it be disagreed to. The committee of conference accordingly inserted in place of this amendment the following:

"Hereby declared to include and apply to all dominions of the United States in the waters of Behring Sea."

Thus the question was intentionally left open. However, it could not, and did not, long remain so. At that time, as well as previously, constant trouble was being experienced by the United States in attempting to guard and protect the fur seals in Alaska. As a result of this disputed and unsettled territorial jurisdiction in Alaskan waters, a convention between the United States and Great Britain was effected, at which these governments agreed to submit to arbitrators certain questions, five in number, regarding the rights of the United States to protect, and its property in, fur seals within the waters of Alaska. President's Proclamation Feb. 29, 1892, 27 Stat. 947. The answers to these questions were received and subsequently ratified by acts of Congress, including a treaty between the United States and Great Britain, fixing, as between these two governments, a 60-mile limit around the Pribilof Islands in Bering Sea, Alaska. Act April 6, 1894, c. 57, 28 Stat. 52 (U. S. Comp. St. 1901, p. 3004).

The conclusion reached by the arbitrators to one of the above-mentioned five questions, as to the extent of the territorial jurisdiction of the United States over seals in the waters in and about the islands and shores of Alaska, was that the United States obtained by the treaty of 1867, and should enjoy, with respect to the waters of Alaska, all the rights possessed and theretofore enjoyed by Russia. However, they held that the territorial limit of 100 Italian miles from the shores of all the Russian territory in Bering Sea, claimed by Russia by ukase of 1821, did not obtain after the treaty between Russia and the United States April 5–17, 1824 (8 Stat. 302), and a similar treaty between Russia and Great Britain 1825, under which treaty Russia restricted her territorial jurisdiction in Alaskan waters to the distance of a cannon shot from the shore; and the arbitrators further found that the United States had no right of protection or property in fur seals frequenting the islands of the United States in Bering Sea waters outside the three-mile limit. International law has fixed or limited the distance of a cannon shot to one marine league from the shore, and it is well recognized by all nations.

Likewise three miles from shore is the limit fixed and ac-

knowledged by all sovereigns of territorial jurisdictions to en-force its penal laws, except where otherwise extended by treaty between the contracting parties, with but few exceptions. While each state or sovereign may provide for the punishment of its citizens for acts committed by them outside its territory, whether felonies or misdemeanors, simply makes the penal law a personal statute, and a matter with which no other country or government may interfere; but to say that the penal laws of our country can bind foreigners and regulate their conduct, either in their own country or in any other foreign country, is to attempt to assert a jurisdiction over such countries and to impair independence. Such is the view on this subject of penal laws by Germany, Denmark, Great Britain, Portugal, France, Spain, Switzerland, Belgium, and the Netherlands; Russia and Greece alone being exceptions. Sweden and Norway are exceptions only where the king orders a prosecution of a felo-ny. Moore's International Law.

Since Japan was not a party to the arbitration and subse-quent treaty between the United States and Great Britain of 1894, and has not since been a contracting party thereto, it might be contended that as to Japan the United States is not bound by the arbitrators' decision of 1892, so limiting the ju-risdiction of the United States over fur seals in the waters of Bering Sea to three miles from its shores.

In La Ninfa, 75 Fed. 513, 21 C. C. A. 434, a case aris-ing over the same subject-matter under the same statutes, Mr. Justice Hawley reached and expressed a different view when discussing this subject, as to the effect of the decision of the arbitrators and to its subsequent ratification by the United States as binding on its citizens as well as those of foreign nations. He says:

"These statutes, whatever their interpretation may be, must be applied to citizens and subjects of all nations, and were not in-tended to apply only to citizens, subjects and vessels of America."

In other words, Judge Hawley's decision holds that the United States, by its acquiescence in the findings of the board of arbitrators selected by the convention held between the

United States and Great Britain, limited its territorial jurisdiction as to its own citizens as well as to those of foreign nations over violations of law for the protection of seals in Alaskan waters to within three miles from the shores thereof. And such is the law as to Japan, its citizens and subjects sealing in Bering Sea. If, therefore, in the present case the libeled vessel did not violate the provision of the statute within three miles of the shore of the said Pribilof Islands, the libel must be dismissed on the ground of lack of jurisdiction.

Thus the second subject of inquiry arises. Admittedly the vessel, when libeled, was within this judicial division, in the custody of the United States marshal at Dutch Harbor, Unalaska, but when taken by the United States revenue cutter was without the three-mile zone. Decisions hold that, even though the original seizure was either void or extraterritorial, yet when not made under the provisions of a treaty, and a subsequent service of process is obtained of the person or vessel when within the jurisdiction, it is not void. The Richmond v. United States, 9 Cranch, 102, 3 L. Ed. 670; The Merino, 9 Wheat. 403, 6 L. Ed. 118; In re Ezeta (D. C.) 62 Fed. 968; In re Johnson, 167 U. S. 126, 17 Sup. Ct. 735, 42 L. Ed. 103; Ker v. United States, 119 U. S. 440, 7 Sup. Ct. 225, 30 L. Ed. 421; United States v. Rauscher, 119 U. S. 435, 7 Sup. Ct. 234, 30 L. Ed. 425.

Assuming the evidence sustains the fourth paragraph of the libel, that the small boat and three members of the crew of the Tenyu Maru were apprehended and captured within the three-mile limit off the shore of the island of St. Paul, and that they did, while within the said restricted line, kill a fur seal, would the cutter of the United States, under orders from the secretary of the treasury, have the right, under the law, to capture the schooner and bring it within the jurisdiction of the proper courts of the United States? Would this act of the crew of the Tenyu Maru, done in violation of the statute, connect the vessel itself with the wrong, though standing without the line of the marine league in such a manner that it could be condemned and forfeited to the United States? Had the Tenyu Maru itself been found by the revenue cutter officials on the morning

of July 9th within the prohibited zone, under the same circumstances in which one of her small boats was discovered, and to capture the Tenyu Maru it had been necessary to have followed her to the location where she was taken, would there be any doubt that when brought within the jurisdiction of this court, and thereafter libeled, she could not be condemned and forfeited because of the fact that she was not actually taken when within the territorial three-mile limit? I do not believe the right to libel and condemn the said schooner is in the least impaired by the fact that she was not so found herself illegally sealing within the prohibited zone, but instead one of her small boats, manned by three of her crew, was so discovered and captured and subsequently the schooner itself taken.

From the uncontradicted testimony alone in this case it is evident that it is not the custom of vessels devoted to seal hunting to hunt seals from the vessel's deck or by means of it, other than to convey the crew, small boats, provisions, ammunition, etc. But, on the other hand, it is patent that the hunting is done by the crew of the vessel going out from the schooner in small boats, as the natives do in their bidarkas, each small boat being manned by either three or four of the vessel's crew; one, the hunter, with his gun occupying the bow, one or two rowing, and the other in the stern to watch for seal and steer the boat. Such was the custom on the Tenyu Maru, and in like manner her crew manned eight small boats on the early morning of July 9th, and such would have been the case had the Tenyu Maru been anchored within the three-mile limit instead of 11½ miles out, as it is alleged she was. The schooner was therefore just as much "engaged in" killing the seals, under the statutes, when the small boat was captured within the three-mile limit on July 9th as though she had been standing within the zone at the time, in the absence of any evidence showing extenuating circumstances.

Section 173, Penal Code, provides that no person shall kill any fur seal within the waters of Alaska surrounding the Pribilof Islands, "and all vessels, their tackle, apparel, furniture and cargo found 'engaged in' violation of this section shall be forfeited."

No citations are necessary, I am sure, to sustain the law that it is not necessary under this statute to actually find the vessel itself "engaged in" killing seals, as distinguished from its crew in small boats so being "engaged in." Under this statute, the cargo is likewise forfeited when the vessel is found engaged in a violation of its provisions.

The evidence shows that the only object of the crews of the Tenyu Maru was to hunt and capture fur seals; that for this purpose only she was equipped with hunters, guns, small boats, provisions, ammunition, and salt with which to pack sealskins. Her only cargo at the time of the capture being 40 fur sealskins.

No reasonable contention can be made under section 173 for excepting such a cargo from forfeiture, but there is every reason, on the other hand, why it should be forfeited. The purpose and object of the statute cannot be enforced by allowing an exception in these cases as to the fur skins, but its provisions should be strictly enforced by applying the penalties in full measure under the law. A sentence for the crew of a few months in the district jail neither deters them from repeating their depredations, nor, as a matter of fact, punishes the real parties in interest, the owners of the vessel and the fur skins; nor does the fact that the vessel alone be forfeited successfully meet the ends of justice, for the object and profit of these voyages are the sealskins, and though the crew be imprisoned and the vessel forfeited, yet if at the end of a jail sentence these seal hunters, who seem to enjoy our federal jails, can secure a new suit of clothes and have their transportation paid and then land in Japan with their fur sealskins belonging to the owners of the vessel, not much punishment has been inflicted, nor have they been in the least deterred from repeating the destruction of one of the natural and valuable resources of this country, now fast disappearing. But when the thing they came, worked, and labored for is forfeited, then I apprehend the punishment will accomplish that for which it was meant. The provision of section 178 of the Alaska Code provides that it shall be unlawful to kill a female fur seal at any season of the year, and "all vessels, their tackle, apparel and furniture whose

'crews' are found engaged in the violation of this section, shall be forfeited to the United States."

The difference in the provisions of sections 173 and 178 is that in the former section, when the vessel, its tackle, apparel, furniture, and cargo is found engaged in killing fur seals, its cargo, as well as its tackle, apparel, and furniture, shall be forfeited; in the latter section, when the "crew," as distinguished from the vessel, is found engaged in killing female seals or using firearms, thereby threatening or frightening the seals from their rookeries on the Pribilof Islands, as provided for in the prior section and referred to in this, then all their vessels, tackle, apparel, and furniture, but not their cargoes, shall be forfeited to the United States. Thus the libel in this case brings the facts under both sections, as was intended.

Under the evidence there can be no doubt that the female seal found in the small boat was killed by the members of the crew of the Tenyu Maru, and, under section 178, the vessel, her tackle, apparel, and furniture, should be condemned and forfeited.

But there is just as much a violation of 173d section. The same question as to the right of the revenue cutter to take the Tenyu Maru arises in any event. If the crew are found violating section 178, to reach the vessel and condemn and forfeit it she must be brought within the jurisdiction; if in one case this can be accomplished under the law, it surely can in the other. The vital point which determines the question of jurisdiction is the situs of the wrong or violation of the statutes.

The master of a vessel is responsible for the acts of his crew when on such a cruise; and, when his men cross the line and kill fur seals, his vessel at once ipso facto becomes liable to forfeiture. The innocence of the owners of the ship cannot exempt the offending vessel; the vessel is the offender and the instrument to which the forfeiture attaches. Were it otherwise there would be no means of suppressing the offense or punishing the wrong.

When the wrong, the act itself, which caused the violation of the statute occurred within the three-mile limit, then the right to punish exists even though it reached to a person or

vessel setting in motion or causing the wrong, and which may be then and may have been outside the jurisdiction of the sovereign on whose territory the wrongful act was committed. The principle that a man who, outside of a country, willfully puts in motion a force to take effect in it is answerable at the place where the evil is done is recognized in the criminal jurisprudence of all countries.

The law is against the right of the United States to capture a vessel belonging to Japan when found sealing at a distance ever so close, but outside the three-mile limit. There can be no doubt that if actually discovered within the prohibited zone and engaged in illegal fur sealing, and escaping before being captured across the line, she could be followed, captured, libeled, and forfeited.

Is the contention any the less doubtful that if the schooner belonged to Japan and, instead of crossing the line within the prohibited zone, remains outside and sends or allows her small boats to go inside and kill fur seals?  It cannot be said that such a practice of evading the statutes enacted for the sole purpose of protecting the fur seal of Alaska find either justice or right under the law, municipal or international.  The evidence discloses the fact that on the morning of July 9th, at about 4 o'clock, the captain of the schooner Tenyu Maru sent his crew off in eight small boats, equipped and for the sole purpose of fur seal hunting.  And while he denies that he intended that they should go inside the three-mile limit, alleging that he warned each and every boat to stay without, yet the testimony of the men conclusively shows that they either did not know or did not care in what direction the seal islands lay with respect to the position of the schooner that morning. Their testimony does show, however, that when they sighted the seal they followed it until captured, regardless of its course of travel.

Making every allowance for these witnesses testifying in a foreign tongue and in a foreign court, through an interpreter, still their statements cannot be trusted, as is attested by the fact that they denied being able to see land that morning, owing to a fog, until after the revenue cutter appeared, at about 9

o'clock a. m.   The officers of the Perry testified that they could see Otter Island at about five miles distant, when they left the island of St. Paul for their daily cruise.   There can be no doubt that these hunters are deliberately attempting to mislead the court from the fact that they were, when first sighted, but a mile and a half from land.

Another circumstance that shows decided guilty knowledge and conduct, if not intent, on the part of the crew of the Tenyu Maru is the fact that four of her small boats failed to return, though the cutter remained for 24 hours at the exact spot they are alleged to have left in the morning.   The conviction of three of the Tenyu Maru's crew by a jury in this court in a criminal cause leaves no question that the crew (that is, a part of the crew) were engaged in and did kill at least one female seal within the three-mile limit.   In that case the evidence necessary to convict was beyond a reasonable doubt. That same testimony is again before this court, with the difference only that a fair preponderance of evidence is necessary in this case to forfeit the vessel, her apparel, tackle, furniture, and cargo.

The facts show that the boat having the three members of the schooner's crew. was, when first noticed, 1½ miles from shore, or 1½ miles inside the 3-mile limit. ` Immediately all hands, upon sighting the revenue cutter, took up their oars in a vain effort to escape without the line and regain the cover of their schooner.   That they knew the direction of the Tenyu Maru there can be no doubt, as they volunteered the information of her location when captured, and at that time they had within their small boat a seal, limp, and whose blood was still warm. While they denied having killed the seal within the three-mile limit, alleging that they had shot the same about 5 in the morning, or one hour after they had left the schooner, yet the evidence wholly disproves their statements in that a fur seal would not remain limp, nor would its blood remain warm, at 9 o'clock, if shot, as they contend, at 5 o'clock in the morning. A clear preponderance of evidence shows that they killed a female seal within the three-mile limit, and that they knew they

were close to shore, a fact they did not deny though questioned directly and repeatedly.

Thus was the vessel itself just as much engaged in the killing of seals within the three-mile limit on the morning of July 9th as though it had been within the line. In either case the schooner would not itself be employed, as is one of her small boats, in the actual killing of a seal. Such was not the intention of Congress when it enacted the provisions of the statute, as the custom of killing fur seals has always been confined to the vessel's small boats or native bidarkas.

Under the facts and circumstances here produced, the schooner Tenyu Maru, to all intents and purposes, was engaged in killing, and did kill, a fur seal on July 9th within the three mile limit, and within the jurisdiction of this judicial division, Alaska, and should therefore be forfeited to the United States, with her apparel, tackle, furniture, and cargo.

While the authority above mentioned holds that the inherent right rests in a sovereign to punish violations of its laws when such violations are occasioned within the sovereign's domain, even though the force causing a wrongful act came from without, yet it finds the difficulty, as we find in this case, to obtain jurisdiction of the person or object; but in my opinion, in this case, so far as this court is concerned, the Tenyu Maru is before this court under its civil process, the respective proctors having filed a stipulation herein now in evidence, admitting that the Tenyu Maru was libeled by the service of process from this court at Dutch Harbor, Unalaska, within the Third judicial division, territory of Alaska, and I apprehend it is not a judicial question for this court to determine by what means or under what circumstances she became so situate, in the event she was not brought there contrary to the provisions of any treaty existing between the United States and Japan.

I find that the schooner Tenyu Maru, her apparel, tackle, furniture, and cargo of 40 fur sealskins, are condemned and forfeited to the United States.

Findings of fact and conclusions of law may be submitted, and a judgment will be entered accordingly.