## WHITELAW v. UNITED STATES.

(District Court, N. D. California, First Division. September 16, 1925.)

No. 17114.

**1. United States ⬤⇒110—Interest on reimbursement for interference with sealing voyage not allowable.**

Act Cong. June 7, 1924 (Comp. St. Supp. 1925, § 991 [26–28]), authorizing reimbursement to citizen for damages by interruption of sealing voyage in the Behring Sea during years 1886 to 1896, provides no provision for payment of interest, and hence interest cannot be allowed.

**2. United States ⬤⇒108—Unlawful interruption of sealing voyage held to authorize recovery of value of probable catch.**

A citizen, who suffered damage or loss from seizure and detention of vessel and interference with its sealing voyages during years 1886 to 1896, held entitled, under Act Cong. June 7, 1924 (Comp. St. Supp. 1925, § 991 [26–28]), to recover from the United States the value of the probable catch of seals and whales, notwithstanding the difficulty of proving and assessing such value.

**3. United States ⬤⇒141—Evidence held to warrant finding of value of probable catch on sealing voyage unlawfully interrupted by the United States.**

In action under Act Cong. June 7, 1924 (Comp. St. Supp. 1925, § 991 [26–28]), against the United States for reimbursement for interrupted sealing voyage, evidence held to warrant award to claimant of value of catch, based on a classification of pelagic seals as Northwest Coast seals, and not as Alaska seals, using the average market value during the years in question for such skins, and also for value of prospective catch of whales.

**4. United States ⬤⇒141—Claimant must establish, not only loss, but amount of damage.**

In an action under Act Cong. June 7, 1924, (Comp. St. Supp. 1925, § 991 [26–28]), for reimbursement for wrongful interruption of sealing voyage, burden is on claimant, not only to prove his loss, but to establish amount of his damage.

**5. United States ⬤⇒142—Measure of recovery for wrongful interruption of sealing voyage stated.**

In an action against United States under Act Cong. June 7, 1924 (Comp. St. Supp, 1925, § 991 [26–28]), for loss caused by wrongful interruption of sealing voyage, plaintiff is entitled to attorney's fees, as well as court costs, and to all expenditures connected with the vessel, occasioned by her seizure and detention, which would not have been made had she been manned by her own crew, transportation and hotel expenses during trial for persons necessarily there, and crew's living expenses while excluded from their usual quarters; but other expenditures, not connected with the defense and not caused by the wrongful seizure and detention, including spending money advanced to crew, cannot be recovered.

At Law. Claim by Thomas P. H. Whitelaw against the United States for damages occasioned by seizure and detention of sealing vessel and interference with a sealing voyage in the Behring Sea. Decree for claimant.

James N. Gillett and Hart H. North, both of San Francisco, Cal., for plaintiff.

Sterling Carr, U. S. Atty., of San Francisco, Cal., and Frank Maytham, Sp. Asst. Atty. Gen., for the United States.

KERRIGAN, District Judge. This unusual and highly interesting case arises out of an act of Congress dated June 7, 1924 (Comp. St. Supp. 1925, § 991 [26–28]), which conferred jurisdiction upon this court "to hear and determine the claims of American citizens * * * for damages or loss occasioned by or resulting from the seizure, detention, sale or interference with their voyage by the United States of vessels charged with unlawful sealing in the Behring Sea and water contiguous thereto and outside of the three-mile limit during the years 1886 to 1896, inclusive, and to enter judgment therefor." Under the terms of this act, plaintiff has filed claims in the amount of $99,000, for losses suffered by reason of alleged unlawful seizure and warning from Behring Sea of the whaling and sealing schooner La Ninfa, during the years 1891 and 1892.

It appears that, after the United States had purchased Alaska from Russia, the two countries divided the Behring Sea between them; each government claiming to have absolute jurisdiction over its entire share, outside as well as within the three-mile limit. At the times here in question, large numbers of fur-bearing seal went each year into the Sea, and for several months remained there, on or near the Pribilof Islands, where it was their habit to breed. Vessels belonging to British as well as American subjects began to follow them in, and killed large numbers of them. Claiming, as aforesaid, that the United States had jurisdiction to prevent an indiscriminate slaughter, the Treasury and Navy Departments of our government ordered their vessels to enter the Sea, to arrest all persons found engaged in sealing there, and to seize and detain their vessels. In a considerable number of instances, such arrest and seizure accordingly were made, and several vessels were forfeited.

During the years 1891 and 1892, plaintiff owned the schooner La Ninfa, a vessel of 120 tons burden, which he used for sealing. On April 1, 1891, she cleared from San Fran-

cisco for a whaling ·and sealing voyage in Northern Pacific and Behring Sea waters, fully equipped for such a voyage, and with a crew of 21 men, some of them experienced seal hunters and whalers. She arrived at the Behring Sea on July 3, 1891, and a few days thereafter put out her boats to hunt for seal. While she was so engaged, the United States revenue cutter Corwin seized her, and took her to Sitka, Alaska, where proceedings were commenced to condemn her. A decision having been rendered by the United States District Court for the District of Alaska, condemning the vessel, an appeal was taken to the Circuit Court of Appeals of the Ninth Circuit. On June 29, 1896, that court reversed the decree of the District Court, and ordered the libel to be dismissed, holding the United States were without jurisdiction over waters of the Behring Sea which were outside the three-mile limit. Whitelaw v. United States (C. C. A.–9), 75 F. 513, 21 C. C. A. 434.

Meanwhile, on November 24, 1891, the La Ninfa had been released on bond, and had returned to San Francisco. On March 2, 1892, she again had cleared for a sealing and whaling voyage in northern waters. When near Shumagin Island, and before reaching Behring Sea, she was hailed by the United States warship Yorktown, was warned by the captain of that vessel not to hunt for seals in the Sea, and was peremptorily ordered to go to Sand Point and land all her sealing gear there. Through obedience of this order the La Ninfa again was incapacitated for sealing, but this time did not lose her liberty.

In the years preceding the decision of the Circuit Court of Appeals, English vessels found sealing within the forbidden territory had been seized and forfeited. The government of Great Britain now demanded that the losses caused by these seizures be compensated, and the matter was referred to an arbitration tribunal. The decision of that body was in accordance with the one above referred to: That the Behring Sea was not a closed, but a high or open sea, and that our government had acted wrongly in exercising dominion over it. The damages suffered by British subjects accordingly were paid, with interest, and proceedings immediately were commenced by the United States against the Russian government, on behalf of American citizens whose vessels had been seized by Russian authority. Those claims also were paid, with interest. For such American citizens, however, as had been unfortunate enough to own vessels seized by their own

government, no relief was afforded at that time.

[1] In 1902 a bill was introduced in Congress, providing for adjudication of American claims. It passed both House and Senate on more than one occasion, but never in the same session, and through lack of cooperation did not become a law until 22 years had elapsed. Despite this great lapse of time, and although most of the wrongs to be redressed had occurred nearly 35 years previously, the act which finally became a law contained no provision for the payment of interest. Inasmuch as interest may not be allowed in suits under a special act unless it is specifically provided for (Watts v. United States [D. C.] 129 F. 222, 226; Pennell v. United States [D. C.] 162 F. 75, 78), no claim for interest can be or has been submitted.

The uncontradicted 'evidence in this case shows that during May and June of 1891 and 1892 large herds of seal traveled northward along the Pacific Coast; that their destination was Behring Sea; that they reached that body of water in June and early July of those years, remaining there until some time in September; that during the months of July and August, and part of September, they were present in the Sea in considerable numbers, especially after August 1st; and that their capture by skilled hunters, unmolested by external interference, was regarded as a certainty. This much cannot be denied. It has been argued by the government, however, that the question of probable catch is not one to be allowed, primarily because of the element of uncertainty and speculation necessarily involved in seal hunting, and that this very factor must eliminate such a claim.

A similar contention was disposed of by the Supreme Court of California in the case of Pacific Steam Whaling Co. v. Alaska Packers' Association, 138 Cal. 632, 638, 72 P. 161, 163, where an action was brought for damages caused by wrongful acts by which the defendant excluded the plaintiff from a salmon fishery. In denying its validity, the court said: "With respect to this kind of damage, of course, there cannot be the absolute certainty possible in many plainer cases; but a wrongdoer cannot entirely escape the consequences of his unlawful acts merely on account of the difficulty of proving damages. He can do so *only where there is no possibility of a reasonably proximate estimation of such damages,* which is not the fact in the case at bar. The waters in question here constituted a special salmon

fishery—where those fishes were to be found in great abundance—and the proposition that damages * * * are entirely beyond legal proof, cannot be maintained." (Italics ours.)

[2] Apart from the question of congressional intent, I think a clear right to recover for plaintiff's wrongful exclusion from the sealing grounds exists in this case. When, however, that intent is considered, I think it cannot justly be denied. American and British subjects have been compensated for similar losses, the United States even acting on behalf of the former in claiming damages from Russia. It is hardly reasonable to believe that Congress intended to deny similar relief to other American citizens, in enacting a law which purported to grant them compensation for exactly similar wrongful acts. Moreover, the terms of the statute itself render such a construction impossible, since it provides for payment for losses resulting from "interference with their voyage," which, of course, will be purely nominal, unless the probable catch of seals is to be included in computing their amount. On this branch of the case the plaintiff, therefore, must prevail.

The question which next arises is: To what would the prospective catch normally have amounted, at the time in question, in an average season? A sealing boat is manned by a crew of three, one of whom is the hunter. The La Ninfa, with a crew of 21 men had six such boats, in addition to two equipped for whaling. Her hunters were skilled in their business. According to a preponderance of the evidence, in 1891 and 1892 it was possible to hunt from 75 to 80 per cent. of the time. One of the government's witnesses testified that the former was "remarkable as a calm year," and that while staying around the Pribilof Islands for several weeks in the summer it had not even been found necessary to use dish racks on the table of his vessel. Conditions better than these for hunting in small boats could scarcely be imagined. Over the amount of probable catch there nevertheless has been considerable dispute.

The complaint alleges that but for interference the La Ninfa would have captured at least 1,800 seals in 1891, and as many more in 1892, an average of 300 seals per boat in each year. No two of the plaintiff's witnesses agreed as to the amount of an ordinary catch. As prospective claimants, all of them were more or less inclined to overestimate it, and perhaps in consequence of that fact their estimates ranged from 300 to 600 seals per boat, averaging about 400. On the other hand, two of the government's witnesses agreed that any catch in excess of 250 seals per boat would be exceptional, basing their opinions on general experience in and around the Pribilof Islands, and partly on the examination and study of records, but to no extent on any acquired in actual seal hunting. The plaintiff's witnesses, however, most of whom had sealed for many years, were unanimous to the effect that the average catch amounted to 300 *or more* per boat, and to this two of the government's own witnesses, both of them experienced seal hunters, unhesitatingly agreed.

[3, 4] The differential between 250 and 300 is not great, and there is a heavy preponderance of the evidence in favor of the latter estimate. I therefore hold that plaintiff's allegations as to probable catch have been sustained, and that he is entitled to recover the value of 1,800 sealskins for each of the two years in which he was excluded by defendant from the Behring Sea. What that value is must now be determined—a question upon which, unfortunately, there is a sharp and irreconcilable conflict in the testimony.

The burden is, of course, upon the plaintiff, not only to prove his loss, but also to establish the amount of his damage. In so far as he fails to meet it, he cannot prevail. According to his counsel, pelagic seals, killed outside the three-mile limit on Behring Sea, are to be classified as Alaska seal, with only a slight reduction in value from that of those killed on the Pribilof Islands. Counsel for the government, on the other hand, insist that pelagic skins are to be classified with those of the Northwest Coast catch, the value of which admittedly is not more than half so great as that of Alaska sealskins. The number of witnesses supporting these views is about evenly divided. Under such circumstances, the natural probabilities of the case must determine the issue. If reasons, drawn from established facts, can be adduced in favor of the correctness of one or the other, a decision between them will become possible.

As to the habits of seal and the practices of sealers, the evidence is clear and explicit. The Pribilof Islands are the breeding grounds for the species known as Alaska fur seal (Callorhinus Alascanus), which each year goes to those islands, and has never been known to land elsewhere. The adult males, or bulls, arrive there early in May, and shortly afterward are followed by the younger males. The cows arrive during the month of June, most of them between June 10 and July 4, and after them come the other members of the herd. Breeding commences with

the arrival of the cows, and continues throughout the latter part of July; most of the cows being kept on the islands by the bulls throughout that time. The former are kept in closely formed harems of approximately 40 each, and are not permitted to leave them until their pups have been born and impregnation for the following season has taken place.

After the 1st of August, however, practically all of the cows are released by the bulls, and are permitted to go to sea. When their pups are born, they remain on the islands and nurse them for about seven days. Thereafter they go to sea, and remain there for a similar length of time, returning at irregular and increasing intervals for the purpose of nursing their young. The adult males, on the other hand, remain on land, and almost on one spot, until approximately August 1st. After that date many of them go away to sleep in isolated portions of the rookeries, and a few others go to sea. During the sealing season, however, the percentage of adult males, which are to be found at sea, is never greater than 25 per cent., while after the end of July more than half the cows are there continuously. As for the younger male seals, they either remain on land, swim in the surf well within the three-mile limit, or move around from one rookery to another. They stay close to shore, as a rule, and very rarely are known to go out to sea.

Now, it appears that between the skins of seals killed on the Pribilof Islands and those of pelagic seals a very substantial difference exists. The Islands skin is that of a young *male*, killed with the greatest care after previous selection, and without the use of firearms, three or four years old, of regular length, and with no blemish on it. It is the skin of an animal killed *only in June or July*, a very important circumstance, in view of the fact that after the end of the latter month any skin taken is of a much lower quality than one taken earlier. Pelagic skins are mostly those of females, and to begin with are smaller than those of the smallest males killed. Wherever torn, or pierced by buckshot, their value is materially diminished, and nearly all pelagic seals are killed by shooting. In a large majority of cases, such seals are killed *after the 1st of August*, at a time when, as stated, the quality of their skins has begun to deteriorate. None of them, of course, are examined previous to slaughter, as is the case with all seals killed on the Islands. These facts are all clearly established by the evidence. It re-

mains to apply them to the testimony above referred to.

Several of the plaintiff's witnesses testified that the skin classification known as Northwest Coast did not include pelagic sealskins, and that the latter had (except for a customary deduction of 5 shillings) the same value as that of Alaska skins. None of these witnesses assigned any reason or explanation for this fact, except that the quality of the two kinds of skins was approximately the same. Most of them were interested witnesses. Plaintiff's counsel have argued that a seal which might have been killed on the Pribilof Islands at 10 a. m. could not so change before being killed, six hours later, while asleep on the surface of the Behring Sea, as to cause a 50 per cent. depreciation in the value of its skin. This plausible contention may well be answered by the language of one of the government's witnesses, given in the case of Algar v. United States, and here admitted by stipulation: "Usually the [pelagic] skin is off season. There is only a very limited time that the skin of the fur is at its prime. * * * *After the 30th or 31st of July no skins are taken on the seal islands of the United States or Russia at all,* because the new hair begins to grow out, and that makes what they call a stagey skin. * * * They do not change any, whether they are killed on the Island or not; the animal is the same."

Mr. Walter Borns, a Seattle fur merchant, engaged in the fur business since 1884, in the same case testified positively, several times, that the skins of the Northwest Coast included the pelagic catch. On cross-examination he stated that "all skins that are not taken on the Pribilof Islands are classified as Northwest Coast, * * * *regardless of quality.*" The severest cross-examination cast no doubt upon his testimony. Reinforced as it is by that of the other government witnesses, I am not prepared to say that its weight has been overcome. On the contrary, because of the explanation here set forth, its seems to me distinctly to outweigh that which has been introduced against it. My finding therefore is that the plaintiff is entitled to recover the market value of 1,800 Northwest Coast skins for each of the two years, 1891 and 1892, and not that of skins of the Alaska catch.

It appears to be uncontradicted that at that time the world sealskin market was in London, England, and that from the prices there fixed 10 per cent. normally was to be deducted for commissions and the expenses of transportation, in computing a net price.

To that market, regardless of the fact that many skins were sold in Victoria and Seattle (to dealers who in turn forwarded them to London). I think the plaintiff is entitled. It was the ultimate, and normally the most remunerative, market to which he might and probably would have shipped. In 1891 the average price for skins of the Northwest Coast, sold in London by the leading firm of fur dealers and auctioneers, Messrs. C. M. Lampson & Co., was 65 shillings. In 1892 it was 68 shillings and 4 pence. Deducting 10 per cent. from these figures, the average prices received by shippers were 58 shillings and 6 pence ($14.11) and 61 shillings and 6 pence ($14.84). These average prices were not, it is true, given out until the end of each season, and were the average prices of all the skins bought and sold. They were based on an average of sales made at public auction, and were the prices actually received by many sellers of skins. As averages, of course, they do not represent the maximum prices, which plaintiff might, through chance, have obtained; neither do they represent the minimum, which according to the testimony of one witness was as low as $12 late in 1891, inclusive of the 10 per cent. allowance. I think average prices should be used as bases of computation here. Plaintiff's damages for loss of the prospective catch of seals accordingly are $25,398 for the year 1891, and $26,712 for that of 1892; in all, $52,110.

The complaint further alleges that in addition to 1,800 seals, in the absence of interference the La Ninfa would have captured three whales, of the value of $18,000, in 1891. Her captain testified that his whalers were considered the best that there were in San Francisco at that time. The vessel was equipped with two whaling boats, and with the latest improved whaling guns. There were whales in the Behring Sea during the period at which it was intended for her to hunt there, and hunting them there was an established and profitable business, in which quite a number of other vessels were engaged. Estimates as to the number of whales which probably would have been caught varied between three and five. It was stated that the average weight of bone from a Wright whale is 1,200 pounds, and that its average amount of oil is 80 barrels. In 1891 the market price of whale oil was 30 cents a gallon, or approximately $13 a barrel, and that of Arctic whalebone varied between $2.75 and $5 a pound. Plaintiff established these facts by only two witnesses; but their testimony was uncontradicted, except by inference, and in view of the difficulties of the case I

regard it as sufficient. The value of an average sized whale, computed at the minimum figure quoted for bone, thus appears to have been slightly in excess of the amount demanded. The sole question on this branch of the case, therefore, is whether or not the plaintiff has a right to recover for the loss of his prospective catch of whales at all.

In the earlier cases there was a tendency to deny a recovery for lost profits as an element of damages. Especially did this rule obtain where there was a loss of profits in the case of an interrupted sea voyage. 13 Cyc. 49; 17 C. J. 785. Such, however, is not the modern rule, which is that, where a loss of profits is shown to be the natural and probable consequence of the act complained of, and their amount is shown with sufficient certainty, a recovery may be allowed. 17 C. J. 786, 787. In Wolcott, Johnson & Co. v. Mount, 36 N. J. Law, 262, 272 (13 Am. Rep. 438), the following statement was made: "Profits expected to be made from a whaling voyage, the gains from which depend in a great measure upon chance, are too purely conjectural to be capable of entering into compensation for the nonperformance of a contract, by reason of which the adventure was defeated. * * * But if the vessel is under charter, or engaged in a trade, the earnings of which can be ascertained by reference to the usual schedule of freights in the market, * * * by these circumstances the means would be furnished to enable the jury to make a proper estimation of the injury resulting from the loss of profits of this character."

Whether or not the last part of this quotation, applied to the present case, would distinguish the rule laid down in the opening sentence, the reference to interference with a whaling voyage there made is purest dictum. The contract before the court was one for the sale of turnip seed and had nothing to do with whaling. In Brown v. Hicks (C. C.) 24 F. 811, 814, however, where the present question actually was presented, it was squarely held that the wrongful discontinuance of a whaling voyage, in breach of a contract that it would continue for a definite length of time, gave rise to a cause of action, and that in such case the measure of damages was the sum which a lay "would probably have amounted to, calculated upon the basis of the average catch of vessels on the ground."

In Parsons v. Terry, 1 Lowell, 60, 18 Fed. Cas. 1269, No. 10,782, cited in Brown v. Hicks, supra, and there followed, Judge Lowell made a similar decision. From his opin-

ion I quote the following: "What is the measure of damages? Upon this point the above-mentioned case of Dennis v. Maxwell is explicit. The court there gave the plaintiff the sum which his lay would probably have amounted to; and I have no doubt this is the true rule. * * * We are obliged to ascertain what the contract was actually worth to the libelant, by discovering, as the jury did in that case, the average catch of vessels on that ground during the season, and calculating the libelant's lay accordingly."

The difference between the cases where catches of fish on weekly fishing trips are involved (The Mary Steele, 2 Lowell, 37, 16 Fed. Cas. 1003, No. 9,226), or those of catching salmon in Alaskan waters (Pacific Steam Whaling Co. v. Alaska Packers' Association, supra), and the present case, is only one of degree. That a properly fitted whaling vessel, under a competent master and manned by an experienced crew, would have taken whales in the Behring Sea in July and August, 1891, seems reasonably to be inferred from the evidence. How many would have been taken by the La Ninfa is, of course, problematical; but in the absence of a countershowing I am unable fairly to say that a prospective catch of three whales in a season is an unreasonable one. The plaintiff is entitled to recover $18,000 as damages for the loss of that catch, in accordance with the allegations of the first count of his complaint.

[5] One other item of claim remains to be disposed of. As a result of the seizure of the vessel in 1891, of the temporary exclusion of her crew, and of the proceedings which were instituted to cause her forfeiture, the expenditure of a considerable sum of money became necessary. Exactly how it was spent cannot be demonstrated with even general exactness, because all of plaintiff's records were destroyed in the San Francisco fire of 1906. The complaint fixes its amount at $10,000; but in their opening brief counsel have reduced it to $9,000. Any finding as to what is due must, because of the state of the evidence, be only an approximation. I think, though, that by the amount of the so-called "spending money," advanced to members of the crew while on shore in Sitka, Alaska, this portion of the claim must be reduced.

Plaintiff is entitled, under the act of Congres, to recover for all damages which he has suffered as a result of the wrongful seizure of his property. Broadly construed, this entitles him to attorney's fees, as well as to court costs; to all expenditures connected with the vessel, which need not and would not have been made, had she been manned by her own crew; to transportation to and hotel expenses during the trials, for all persons necessarily there; and to the crew's living expenses while excluded from their usual quarters. But other expenditures, not connected with the defense or caused by the wrongful seizure and detention, and which had the La Ninfa been at sea, would not have been made, cannot be the subjects of a recovery, because they do not proximately result from the defendant's wrongful acts. To this category all money advanced to the crew, other than for necessities, of course, belongs.

The judgment of the court is that the plaintiff recover from the defendant: (1) For the loss of his probable catches of seals, in 1891 and 1892, the sum of $52,110; (2) for the loss of his probable catch of whales in 1891, the sum of $18,000; and (3) for the money expended as a result of the seizure of his vessel in 1891, the sum of $7,000—amounting in all to the sum of $77,110, with his costs of suit. It is so ordered.

NOTE.—I am authorized to state that Judge PARTRIDGE concurs with the views herein expressed.

### Supplementary Memorandum.

Preparation of the findings in this case has disclosed certain errors of computation, which it is the purpose of this memorandum to correct. The plaintiff, as already stated, is entitled to 58s. 6d. for each of the 1,800 seal of his probable catch in 1891, and to 61s. 6d. for that of 1892. In converting these figures into American currency, the prewar rate of sterling exchange, which was $4.866, should have been used in determining the value of the English pound, and plaintiff's recovery, therefore, should have been fixed at $14.233 per skin for 1891, and $14.963 for 1892. The total recovery thus amounts to $25,619.40 for the first of those years, and to $26,933.40 for the second—in all, to $52,552.80 for the loss of seals.

The values used in assessing damages for the loss of catch of whales appear to have been inaccurate, because of a failure judicially to notice that the contents of a whale-oil barrel are 31½ gallons, instead of 43⅕. The value of a single barrel hence is $9.45 for the year 1891, and not $13, which necessitates a proportional reduction in the amount of plaintiff's recovery.

In 1891 the price of whalebone varied between $2.75 and $5 a pound, not, as did that of sealskins, because of market fluctuations, but on account of the varying quality of bone. Arctic or bowhead whalebone sold for $5 a pound, whereas the more inferior grades of Behring Sea or "Northwest" bone were worth only $2.75. The only testimony as to particular sales shows that one whaling vessel realized $3.50 a pound upon a cargo taken in Behring Sea during the year 1891. I think an average price of $3.87½ is all that the proof justifies for purposes of a recovery.

The value of a Wright whale of average size, thus computed, was $5,406 in 1891, inclusive of 80 barrels of oil and 1,200 pounds of bone. That of three whales, the number allowed as constituting the probable catch, therefore, was $16,218, instead of $18,000.

Judgment may issue for $75,770.80; findings to be prepared forthwith.