IDA M. OLSON, Appellee, v. SOUTHERN SURETY COMPANY, Appellant.

**INSURANCE:** Accident Insurance—Avoidance of Policy—Burden of
1 Proof. The insurer in an accident insurance policy has the burden

of proof to establish the defense that the policy is wholly avoided because the insured, in obtaining the policy, had falsely represented that his habits of life were ''correct and temperate,'' and had thereby intentionally deceived the insurer. Evidence held insufficient to establish such defense, as a matter of law. (See Book of Anno., Vol. 1, Sec. 8940, Anno. 27, 29.)

INSURANCE: Accident Insurance—Avoidance of Policy—Burden of Proof. An accident insurance policy (against injury sustained solely through external, violent, and accidental means) which provides, in effect, that it does not cover injuries sustained by reason of the intentional act of any person except assaults upon the insured by a person committing or attempting to commit robbery, casts upon the *insurer* the burden to establish (1) that the insured was injured by the intentional acts of another person, (2) that the *injury* was intentional, and (3) that such other person was *not* committing or attempting to commit robbery. Evidence held insufficient to sustain such defense, as a matter of law. (See Book of Anno., Vol. 1, Sec. 8940, Anno. 27, 29.)

INSURANCE: Accident Insurance—Intentional Acts Resulting in Injury—Presumption. Under a policy of accident insurance which exempts the insurer from liability for injuries sustained by the insured by reason of ''intentional'' acts, the presumption will be indulged that injuries inflicted upon the insured by another person were *not* intentional.

Headnote 1: 1 C. J. pp. 496, 506.  Headnote 2: 1 C. J. pp. 442, 443, 497, 506.  Headnote 3: 1 C. J. p. 495.

*Appeal from Woodbury District Court.*—MILES W. NEWBY, Judge.

APRIL 9, 1926.

REHEARING DENIED JUNE 21, 1926.

ACTION to recover upon an accident policy for the accidental death of Emil Olson. Verdict and judgment for plaintiff. The defendant appeals.—*Affirmed.*

*Henderson, Fribourg, Hatfield & Fribourg,* for appellant.

*A. H. Bolton,* for appellee.

MORLING, J.—I. In the application for the policy, the in-

sured answered "yes" to the question, "Are your habits of life correct and temperate?" The insured answered "yes" also to the question:

1. INSURANCE: accident insurance: avoidance of policy: burden of proof.

"Do you understand and agree that, as * * * the above representations are made to induce the issuance of an insurance policy, should one or more * * * prove to be false, all right to recovery * * * shall be voided * * * if such false answer were made with actual intent to deceive or materially affect the acceptance of the risk or the hazard * * *"

The defendant pleaded that the representation was false, and so known by the insured at the time, and made with the actual and fraudulent intent of deceiving it. Defendant asked for a directed verdict on this ground.

The policy appears to have been issued July 30, 1923. Insured died December 21, 1923. He was admitted to the hospital December 13, 1923, suffering from bruises and acute alcoholism. The third day, he developed traumatic pneumonia, which the physician said might have resulted from lowered vitality, due to the injuries, and subjecting the insured to infection from the pneumococcus present in practically every individual. The physician testified that the insured was robust, in good flesh, and showed no weakening of any particular organ because of liquor or other vices. The plaintiff, to whom insured had been married about 20 years, testified that she could not say that insured was a drinking man; that she had seen him when he had had a few drinks, but never when he did not know what he was doing and could not control himself; that, from and before the date of the application, insured had been home every night, was in good condition, and had not taken a drink for some time, to her knowledge; that she did not know of his taking a drink anywhere near that time. A stepson, who had lived in the same household between 15 and 20 years, testified that:

"Insured didn't use intoxicants to excess or as a habit; stayed home nights during that time. I never saw any evidence of intoxication about the home; he worked practically every day for the last 5 or 10 years. Before going into the soft-drink parlor, he worked at the carpenter trade. * * * I have seen in-

sured when he was drinking, but never when he was unable to take care of himself * * * could stand a good deal of liquor.''

Jorgenson, referred to later, called by defendant, testified that he had known insured 25 years; that they had taken a drink together now and then.

''I don't believe I have ever seen that man drunk. When I was up at your office, I told you that Emil Olson was an exceptionally heavy drinker, and constantly under the influence of liquor.''

Police officers testified to having seen him under the influence of liquor,—''not regular, but he was a man that always worked where liquor was sold; he was a bar tender for years;'' had had trouble at the saloons where he worked. A former member of the board of supervisors, who had known insured about 30 years, and lived about a block from him, and saw him about every day, testified:

''Whether within the last 5 years he used intoxicating liquors is more than I know. I never saw him drunk. I never saw him take a drink. I visited his home, was intimate with the family, belonged to the same church. When Emil was a young man, he used to go to our church quite often, and to our Sunday school.''

Another witness testified that he used to visit back and forth every week or two for a long time at insured's home; saw him quite often two or three years ago; never saw him under the effects of intoxicating liquor; saw him take a drink down town; did not know whether he stayed at home nights. The insurance agent who delivered the policy said he had known insured about 20 years before he took the application; in the last few years had not seen much of him, ''but 15 or 20 years ago, I saw him quite frequently, and up until I took the application, I met him every few days at least, and was fairly acquainted with him for some years.'' Defendant's underwriter, whose duty it was to pass upon applications, testified:

''Had I known that in fact Emil Olson's habits of life were not correct and temperate, I would not have * * * permitted the policy in suit to have been issued.''

He said that there was no inspection on this risk. Where there is an inspection which is not satisfactory, they cancel the

policy. The insured appears to have been a carpenter, and operated a "soft-drink parlor" for a time. The alcoholism referred to was acute, and not chronic. Further evidence appears later.

The entire application is not before us. We do not know what the insured said about his occupation or history. The agent was "fairly" acquainted with him. The question under consideration calls for an opinion. The opinions of those who indulge in intoxicating liquors and patronize bootleggers concerning the correctness and temperance of their habits differ from the opinions of those who believe in total abstinence and in the observance of the laws intended to abolish intemperance. Such opinions vary according to the circle in which the individual moves. It would be entirely proper for the defendant to have ascertained whether an applicant uses intoxicants or not. If it desired a definite representation on that subject, it might have asked the specific question.

"To avoid the policy, it was necessary not only to show the fraud alleged, but that defendant was thereby deceived, and, in reliance upon the truth of the representations, issued the policy which it seeks to avoid. To establish such evidentiary fact of bad faith, falsehood, or deception, it is held in a multitude of cases that the proof must be 'clear,' 'satisfactory,' 'convincing.'" *Ley v. Metropolitan Life Ins. Co.*, 120 Iowa 203, 208.

See, also, *Murphy v. National Trav. Ben. Assn.*, 179 Iowa 213, 223; *Teeple v. Fraternal Bankers' R. Soc.*, 179 Iowa 65; *Muhlbach v. Illinois Bankers L. Assn.*, 108 Neb. 146 (187 N. W. 787).

An incorrect statement of opinion will not avoid the policy, if made in good faith and without intention to deceive. *Royal Neighbors of Am. v. Wallace*, 73 Neb. 409 (102 N. W. 1020); *Muhlbach v. Illinois Bankers Life Assn.*, 108 Neb. 146 (187 N. W. 787).

The defendant had the burden of proof. We do not think it is for the court to say, as matter of law, that this defense was sustained.

II. The policy insured against "the effects resulting exclusively of all other causes from bodily injury sustained during the life of this policy, solely through external, violent and acci-

2. INSURANCE:
accident insur-
ance: avoidance
of policy: bur-
den of proof.

dental means * * * subject to all the conditions, limitations and exclusions and within the amounts hereinafter expressed * * *" It contained the provision:

"Neither does this policy cover injuries (fatal or nonfatal) sustained by the insured by reason of the intentional act of any person (assaults upon the insured by any person committing or attempting to commit robbery or burglary excepted)."

The court told the jury, in effect, that, if the defendant had proved by a preponderance of the evidence that the insured came to his death by reason of the intentional act of some other person who was not at the time engaged in or attempting to commit robbery, then said fact would not bring the plaintiff within the terms of the policy. The objection made to this instruction is that it imposed upon the defendant the burden of proving that the injuries, if the result of the intentional act of others, were not inflicted while a robbery or attempt at robbery was being committed. Defendant contends that it had the burden of proving only the intentional infliction of the injuries by another, and that it was for the plaintiff then to prove that the perpetrator was engaged in committing or attempting a robbery.

The burden of proof was upon the defendant to bring itself within the exception. *Allen v. Travelers Protective Assn.*, 163 Iowa 217; *Jordan v. Iowa Mut. Tornado Ins. Co.*, 151 Iowa 73; *Jones v. United States Mut. Acc. Assn.*, 92 Iowa 652; *Cole v. Iowa State (Mutual) Ins. Co.*, 201 Iowa 979; *Correll v. National Acc. Soc.*, 139 Iowa 36; *Payne v. Fraternal Acc. Assn.*, 119 Iowa 342; *Rowe v. United Com. Trav. Assn.*, 186 Iowa 454. The exception does not extend to all injuries inflicted by the intentional act of another. Therefore, the defendant does not sustain the burden of proof by proving the general fact that the injuries were so inflicted. If the perpetrator was engaged in committing or attempting to commit a robbery, the case was not within the exception. The plaintiff sustained the burden of proof upon her by showing that death resulted from external, violent, and accidental means. If injuries were inflicted by another intentionally, but it did not appear that the perpetrator was not engaged in robbery or an attempt at robbery, the defendant had not brought itself within the exception. It may be, as argued by

defendant, that there would be no presumption that the assailant was engaged in committing or attempting robbery. That would go merely to the weight of evidence, or to the duty of introducing evidence. The burden of proof resting upon the defendant to bring itself within the exception was not shifted. *Gibbs v. Farmers' & Merch. St. Bank*, 123 Iowa 736. If the exception to defendant's liability were the general one, injuries sustained by reason of the intentional act of any person, the defendant concededly would have the burden of proof, and the plaintiff would merely be under the necessity of meeting defendant's proof. Defendant in effect claims, however, that, by narrowing and limiting the exception, and its defense based upon the exception, the burden of proof upon the plaintiff is enlarged so as to require her to prove affirmatively that the assault was not committed in the course of a robbery. We think the instruction was not erroneous.

III. Another ground of motion to direct was that the record showed that the injuries were sustained from the intentional act of another who was not committing or attempting to commit robbery at the time.

Chris Jorgenson testified that, about 3:30 or 4 o'clock in the afternoon, insured borrowed of him $5.00, and together they went to "a bootlegging joint" occupied by Laura Wold Stave, known as the "Mad House." He said that the insured told him that he had helped move the people in there, and wanted to help move them out, and that they were almost moved out when the witness and insured got there; that there was nothing to sit on; that they finally sat down on a mattress; that Laura Wold Stave, Emma Olson (not the plaintiff), and Chris Morris were there. While they were there, Herman Hanson came in. Hanson and Morris had a few words, and Morris followed Hanson out, and said, "I am going to get you." Morris chased Hanson out.

"We started to go out, and in the meantime Laura Wold and this fellow Morris went out, and Emil Olson and I got out in the hallway to go down, and Emma Olson said, 'Emil, go in there; they are fighting; he is fighting with Laura;' and Emil Olson went in, and I stayed there in the hall maybe five or ten minutes, and Emma Olson said, 'You had better go in' to the

room where Emil and Laura were. I went into the other room. Emil Olson was on the floor, and the other fellow, Morris, was standing there, and I asked Morris to help me take care of Olson. We picked him up and took him into another room and laid him down. I went down and got Clarence Nelson and another fellow down there, to help me take Emil Olson out. Emil could walk, by having hold of us. * * * I heard no dispute in that room after Emil went in there. When I went into that room, I said to this Chris Morris, who was the only man in there at that time, 'If you did this, you are man enough to help me take care of him;' and he said, 'I will do anything for you.' I gave Emil Olson $5.00 just before he went upstairs. I didn't see Olson spend any more money up there than for one drink he bought. He spent a dollar, I guess. I don't know whether he got any money back,—I didn't see it. * * * They had this liquor in a quart milk bottle. After Mr. Olson went in the room with this man, Chris Morris, I didn't hear the dispute in that room. When Morris walked in there, he was carrying that milk bottle. * * * The woman who was in the room there with this man, Chris Morris, was Laura Stave; but I didn't see her when I got into the room. Don't know what became of her. I didn't hear any outcries in that room. I am a little hard of hearing. * * * I didn't see Morris have any cane or club. Emil was unconscious when I first went in there. It took about ten minutes before we took him down, and I had to go out and get Clarence Nelson to help me do that. When I got back, Morris was there at the door. I couldn't say whether there was anything in this room where Mr. Olson was attacked, other than the bare room. * * * Mr. Olson spent some money there in this place, $1.00, and received some change.''

Hanson testified that, when he ''came up there, these people were joshing and kidding one another on a mattress lying on the floor there.''

''I sat down alongside of them. They were joshing one another, and so here comes Laura and this man Morris up there, and they started to fight. Mr. Olson and I and Mr. Jorgenson tried to square the fight, and I got knocked to the floor, and I thought to myself, 'I ain't going to fight,—I never was a fighter anyway;' so I went downstairs the back way. * * * When

I came back in the alley there again, here comes Mrs. Wold from the back way down, with her hair all over her head, and I hollered to her, and she said, 'Go on up and help Emil, because Chris is going to kill him.' Now I didn't think that that fellow was able to handle Mr. Olson, because he is a man of his own. I never saw what Olson had been hit with. The only drinking that I saw was that they brought a milk bottle half full of liquor * * * and this man Morris had it in his hand when he went after me. * * * I don't know anything about the amount of money Emil Olson had on him when he was up there at that place that day. I saw no evidence of any firearms or other dangerous weapons up there that day.''

Police officers testified that there was no complaint made about any robbery or holdup.

The physician testified that insured had bruises on the soft part of the face, neck, and chest, quite extended in area; was in a very serious condition; face and neck were badly swollen; had hemorrhages under the skin of the face and neck.

''There were large black bruised areas over the chest, and there was necessarily shock and bruises to the lung and tissue itself.''

The death certificate states:

''The cause of death was as follows: Pneumonia, duration 5 days; contributory (secondary) alcoholism, duration 3 months.''

The physician testified that pneumonia might have caused the death, and a trauma might have caused the pneumonia; that there might have been other causes. Pneumonia is an infectious disease. Most any infection of any trauma could have caused the pneumonia. There was evidence that insured was of amiable disposition when sober, but quarrelsome when drinking heavily. Other evidence bearing on the question has been previously referred to.

As stated, the burden of proof on this question was upon the defendant. The presumption (though not conclusive) is that the injuries, though inflicted by another, were not inten-

3. INSURANCE: accident insurance: intentional acts resulting in injury: presumption.

tional. The burden is upon the defendant to show that they were intentional. *Allen v. Travelers Prot. Assn.*, 163 Iowa 217; *Caldwell v. Iowa St. Trav. Men's Assn.*, 156 Iowa 327. The evidence respecting the cause, nature, and character of the injuries is quite indefinite. It is a reasonable conclusion that they were suffered in the course of a drunken brawl in which the insured intervened between Morris and Laura Wold. It is not conclusively shown that the blows which inferentially fell on the insured were intended for him. Such proof is essential, to bring the defendant within the exception. *Robinson v. Hawkeye Com. Men's Assn.*, 186 Iowa 759; *Union Acc. Co. v. Willis*, 44 Okla. 578 (145 Pac. 812, L. R. A. 1915D 358); *Cooper v. National Life Ins. Co.*, 212 Mo. App. 266 (253 S. W. 465); 1 Corpus Juris 442. The injuries that gave rise to the pneumonia might have been those evidenced by the bruised areas over the chest that the physician speaks of. It is as likely that they were the result of the stepping, stumbling, or falling of drunken participants in the row on the insured when he was down, as from blows from the milk bottle inflicted by Morris in assaulting the insured, which seems to be the theory of the defendant. Of course, Morris might have kicked or jumped on the insured. The court, however, is not at liberty to select one of various inferences that may be drawn from the evidence, and upon that determine the case as upon a question of law. It is for the jury, and not the court, to determine what inference is to be deduced from the facts proven. *Mah See v. North American Acc. Ins. Co.*, 190 Cal. 421 (213 Pac. 42). Kicking or treading upon the insured also must have been intentional, and with intent to inflict the injury that was actually inflicted. *Cooper v. National Life Ins. Co.*, 212 Mo. App. 266 (253 S. W. 465); 1 Corpus Juris 442.

We do not overlook the difference between the language of the policy under consideration,—namely, injuries "sustained by the insured by reason of the intentional act of any person,"— and that of other policies, using the term "injuries intentionally inflicted." A distinction has been drawn in two cases that have come to our attention: *National Life Ins. Co. v. Coughlin*, 72 Colo. 440 (212 Pac. 486); *Ryan v. Continental Cas. Co.*, 94 Neb.

35 (142 N. W. 288, 48 L. R. A. [N. S.] 524, Ann. Cas. 1914C 1234). We cannot accept these decisions as authority. A large, if not the greater, proportion of accidents occur by reason of some intentional act. They are none the less, on that account, accidental. To sustain this distinction and give the exception such a literal construction would make impotent the policy in a large proportion of cases. The intention, in our opinion, must be to commit injury, as well as to do the act, and must be toward the insured,—conduct intentionally directed to injuring him. *Cooper v. National Life Ins. Co.*, 212 Mo. App. 266 (253 S. W. 465); *Continental Cas. Co. v. Cunningham*, 188 Ala. 159 (66 So. 41, L. R. A. 1915A 538). See *Kascoutas v. Federal Life Ins. Co.*, 193 Iowa 343. We are of the opinion that the cause, nature, extent, and effect of the injuries were matters of inference for the jury to draw, and were not for the determination of the court, as conclusions of law.

The judgment is—*Affirmed*.

EVANS, STEVENS, FAVILLE, and VERMILION, JJ., concur.