BIRD et al. v. UNITED STATES, and 23 other cases. *

Circuit Court of Appeals, Ninth Circuit.
March 12, 1928.

Nos. 5067-5090.

1. United States ⬤➡96—To warrant claim for government's interference with sealing voyage vessel must have been intended for sealing and interfered with on that ground (28 USCA § 52).

In order to show interference with sealing voyage, warranting recovery of damages against United States under Act June 7, 1924 (28 USCA § 52), permitting claims against it for unlawful interference with sealing voyage in Bering Sea during particular years, vessel must have had matured purpose of sealing in the designated waters, and interference must have been on account or on charge of alleged unlawful sealing operations.

2. United States ⬤➡96—Warning with threat of force to vessel in course of sealing voyage, followed by vessel's compliance, constitutes "interference" with "voyage" (28 USCA § 52).

To constitute interference by government with sealing voyage in Bering Sea, within Act June 7, 1924 (28 USCA § 52), which permits claims against government for such interference during particular years, physical force need not be actually employed, but warning to vessel in course of sealing voyage, with express or implied threat of force, followed by compliance therewith, is sufficient; "voyage" meaning an actual voyage, as distinguished from one existing only in desire, or which might have been taken, but for government's opposition.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Interfere—Interference; Voyage.]

3. United States ⬤➡141—Evidence held to require finding of government's unlawful interference with sealing voyage of vessel warned against sealing (28 USCA § 52).

In suit against the United States under Act June 7, 1924 (28 USCA § 52), permitting recovery for damages resulting from seizure, detention, sale, or interference with their voyage by United States of vessels charged with unlawful sealing in the Bering Sea, evidence held, to require finding of interference with vessel boarded and warned against sealing on pain of seizure and forfeiture, where guns and ammunition were taken from her on sealing expedition.

4. United States ⬤➡141—Evidence held to sustain findings, in suits for unlawful interference with sealing voyages in Bering Sea, that vessels were not interfered with (28 USCA § 52).

In suits brought against United States under Act June 7, 1924 (28 USCA § 52), for unlawful interference by government with vessels charged with unlawful sealing in Bering Sea during particular years, evidence held to sustain findings that vessels not shown to have abandoned projected sealing voyage after warning, and vessel licensed for fishing trade, and others warned before setting out on voyage, were not interfered with, so as to permit recovery by owners for their heirs.

*Rehearing denied April 30, 1928.

5. United States ⬤➡141—Evidence held to require finding that sealing voyages in Bering Sea were effectually interfered with, where, after warning, vessels went elsewhere (28 USCA § 52).

Where vessels engaged in sealing expedition were boarded and warned to keep out of Bering Sea, and subsequently gave up sealing expedition in Bering Sea waters, but hunted seals elsewhere, evidence required findings that such vessels were effectually interfered with on charge of unlawful sealing, in suits against United States under Act June 7, 1924 (28 USCA § 52), though one of the vessels was warned by British officers.

6. Fish ⬤➡4—Schooner licensed for coasting trade was entitled to engage in seal hunting in Bering Sea (28 USCA § 52).

Fact that schooner was licensed only for coasting trade held, not to prevent it from lawfully carrying on sealing operations in Bering Sea, within Act June 7, 1924 (28 USCA § 52), in view of custom regulations.

7. United States ⬤➡141—Evidence justifying inference that vessel embarked elsewhere warranted denial of recovery for government's interference with sealing voyage (28 USCA § 52).

Where, in suit against United States under Act June 7, 1924 (28 USCA § 52), for interference with sealing voyage in Bering Sea, evidence permitted reasonable inference that owners intended and embarked on voyage elsewhere than in the Bering Sea, denial of recovery was not error.

8. Appeal and error ⬤➡1178(6)—Suits against United States, in which court erroneously found government had not interfered with sealing voyages, were required to be remanded for new trial on issue of damages (28 USCA § 52).

Suits against United States, under Act June 7, 1924 (28 USCA § 52) for interference with sealing voyages in Bering Sea, in which trial court erred in finding that vessels had not been interfered with, were required to be reversed and remanded for new trial for determination of question of damages, though trial court based its decision partly on ground that damages were insufficiently shown.

Dietrich, Circuit Judge, dissenting in part.

In Error to the District Court of the United States for the Southern Division of the Northern District of California; George M. Bourquin, Judge.

Separate actions by Ellen Bird and others against the United States. Judgments for the United States, and plaintiffs bring error. Affirmed as to some of cases, and as to others reversed and remanded.

Rehearing denied: DIETRICH, Circuit Judge, dissenting.

J. N. Gillett and H. H. North, both of San Francisco, Cal., for plaintiffs in error.

George J. Hatfield, U. S. Atty., and T. J. Sheridan, Asst. U. S. Atty., both of San Francisco, Cal.

Before GILBERT, RUDKIN, and DIETRICH, Circuit Judges.

DIETRICH, Circuit Judge. The above-entitled case and 23 others, numbered consecutively from 5067 to 5090, inclusive, are of like general character and have been submitted together, though upon separate records. They are all brought under the provisions of the Act of June 7, 1924 (43 Stat. 595 [28 USCA § 52]), conferring upon the United States District Court for the Northern District of California jurisdiction "to hear and determine the claims of American citizens, their heirs and legal representatives, for damages or loss occasioned by or resulting from the seizure, detention, sale, or interference with their voyage by the United States of vessels charged with unlawful sealing in the Bering Sea and water contiguous thereto and outside of the three mile limit during the years 1886 to 1896, inclusive." The legislation grew out of conditions somewhat fully explained in Whitelaw v. United States (D. C.) 9 F.(2d) 103.

Each case rests in a measure upon its own distinctive facts, but in some respects the proofs are substantially common to all. The several plaintiffs were and are represented by the same counsel, trial by jury was duly waived in all cases, and they were submitted to and decided by the same judge, at the same time.

[1, 2] Generally, it is to be noted that the jurisdiction conferred, being special, to be granted the relief sought must come within all the terms of the act. Only American citizens or their heirs or legal representatives may maintain the action. The damage claimed must have resulted from the (1) seizure, detention, or sale of a sealing vessel, or from other interference with her voyage, (2) upon a charge of unlawful sealing in the Bering Sea or contiguous water, and (3) within the designated period of 11 years. Inasmuch as most of the claims rest upon the charge of "interference" only, it is to be said that "voyage," as used in the act, imports an actual voyage, as distinguished from one existing only in desire, or which might possibly or probably have been undertaken, but for the well-known opposition of the officers of the government. There must have been interference with a specific voyage, in progress, with the matured purpose of sealing in the designated waters, and the interference must have been on account of or on a charge of such purpose, which was then claimed to be unlawful. Mere warning, or notice of the government's attitude, to a vessel afloat, but having no present intent to make a sealing voyage into such waters, would not constitute the requisite interference, nor would interference with or seizure of a sealing vessel in good faith, upon some ground other than the charge that she was sealing or intending to seal in the forbidden waters, be sufficient to bring the case within the statute. The act contemplates compensation to those who were lawfully sealing, but with whose operations the government wrongfully interfered, under and because of the mistaken notion that such sealing was unlawful. But we are not to be understood as holding that, to constitute interference, it is essential that physical force was actually employed. Warning, with threat of force, express or implied, to a vessel in the course of a sealing voyage to or in the forbidden waters, followed by compliance therewith and on account thereof, is thought to be sufficient; but there must have been both warning and resulting compliance

In conferring jurisdiction upon the court, it was doubtless contemplated that in determining a claim the court would follow ordinary rules of judicial procedure and of evidence. Law v. United States, 266 U. S. 496, 45 S. Ct. 175, 69 L. Ed. 401. In only two cases is there any question respecting the citizenship of the persons suffering the loss for which claim is made. In nearly all, if not all, there is controversy touching the propriety of the finding in respect to the requisite interference to constitute a cause of action, and in all the defendant challenges the adequacy of the proof of damages to warrant a judgment in plaintiffs' favor. The assignments relate exclusively to findings and conclusions made and requested findings declined. Though the proceedings in respect thereto were somewhat irregular, we think they were sufficient to authorize review. It should be added that, in disposing of a group of 35 cases, including those herein involved, the court in one of them, referred to as the "Beck Case," rendered a decision in which were discussed certain considerations generally applicable to all or many of the cases, and then, adopting such discussion in each individual case, made and filed a special memorandum therein designated variously as "decision," "findings and decision," and "findings of fact and opinion." With these general observations, we pass to a consideration of the records severally.

### The Bird Case—No. 5067

Involves a voyage of the schooner Sierra in 1886. Ownership of the vessel, the citizenship of the owners, and the representative ca-

pacity of the plaintiffs are not in question. The interference charged is that at a point in the Bering Sea outside of the three-mile limit, on June 27, 1886, an officer from a United States revenue cutter boarded the vessel and upon a charge of unlawful sealing took possession of some guns and ammunition (apparently four rifles and 1,100 rounds of ammunition therefor), and warned against sealing in the Bering Sea on pain of seizure and forfeiture. The complaint alleges that the expedition was for "hunting and sealing," the vessel having a crew of 10 men, including 4 hunters, and being otherwise equipped and outfitted for hunting seal, otter, and walrus. The damages claimed were $500 as the value of the rifles and ammunition, and $5,500 on account of seal skins, $5,000 for walrus skins, and $5,000 for otter skins, which it is claimed would have been taken, but for the wrongful interference.

In a very brief decision the lower court found for defendant, "that the Sierra's sealing voyage was not broken by defendant as alleged. So far as appears, the vessel continued sealing despite defendant's warning." For the significance of the seizure of the guns, the court referred to the decision in the Beck Case. Subsequently, upon plaintiff's request, the court found that on January 27, 1886, at the port of San Francisco, the Sierra cleared for a sealing voyage in the Bering Sea, but declined to find that defendant wrongfully interfered therewith, or that plaintiffs were damaged in the sum of $5,000. Exceptions were taken.

The scope of our review upon this primary question whether or not there was in fact effectual interference is necessarily within narrow compass. Plaintiffs have the burden of proof, and as the trier of issues of fact the function of the judge was like that of a jury. His findings we cannot disturb, unless they are held to be so clearly against the evidence as to be unwarranted as a matter of law. The evidence cannot be said to be conflicting, but it is extremely meager. To reach the ultimate conclusion desired by plaintiffs, it was necessary to draw inferences, and within the range of reason what deductions were to be made from probative facts was a matter for the trial judge. Sioux City & Pac. R. R. Co. v. Stout, 84 U. S. (17 Wall.) 657, 21 L. Ed. 745; Slentz v. Western, etc., Co. (C. C. A.) 180 F. 389; Smith v. Baltimore & Ohio R. R. Co. (C. C. A.) 210 F. 414; Olson v. Southern Surety Co., 201 Iowa, 1334, 208 N. W. 213, 217; Froling v. Howard, 125 Me. 507, 131 A. 308. [3] The evidence leaves no room for doubt

that at the time and place alleged the Sierra was boarded and warned against sealing, as alleged, and the guns and ammunition were taken from her; and we further think the unavoidable inference is that the guns and ammunition were seized solely upon the supposition that they were being used, or were intended for use, in sealing. And, even if it were to be held that upon its face the record in a proceeding thereafter brought in an Alaska court to condemn the articles so seized purports to show jurisdiction—a proposition subject to the most serious doubt—the conviction is unavoidable that the officers seized the arms because of their supposed unlawful use in sealing, and that in view of all the circumstances the later suggestion that the vessel was engaged in the unlawful enterprise of carrying four rifles from San Francisco into Alaska, in violation of section 1955, R. S. U. S., was a mere pretense.

While, therefore, we think the court was justified in holding that by reason of this incident alone the voyage of the Sierra was not broken up as alleged, still there was a measure of interference upon the charge of sealing; that is, such interference as is implied in boarding and warning her, and taking from her the rifles and ammunition.

The other general question is of the damage proximately caused by such interference. The burden was on the plaintiffs, not only to show interference, but the amount of their loss proximately resulting therefrom. Does the record furnish any basis upon which to make an intelligent estimate? It was stipulated in this case, as in all others, that the sealing season in Bering Sea was ordinarily from about the 1st of July to the middle of September. Touching the course of the Sierra and what she did during the remainder of the summer, the record is wholly silent. After she was boarded on June 27th, and permitted to go on her own way with a warning only against sealing in Bering Sea, but with no objection to her hunting for walrus and otter or sealing in other waters, we hear nothing of her until September 17th, after the close of the sealing season, upon which date she was "surrendered" at Port Townsend, because, as the port record shows, of "ownership changed." Were it proper to presume compliance with the sealing warning, a question we need not decide, it still remains true she was at liberty to carry out the other purposes of the voyage; and according to the complaint otter skins and walrus skins were each deemed to be as important as seal skins. Indeed, in the shipping articles it was recited only that the Sierra

was "bound on a hunting and walrus voyage." In the light of the meager circumstances disclosed by the record, including the fact that the Sierra did not for 2½ months, and until after the close of the hunting season, return to port, it is not a natural and certainly not a necessary inference that the voyage was wholly broken up and abandoned in June.

But, if we were to assume such abandonment, we still think the record would be insufficient. The only feature thereof that can have any possible bearing upon the amount or measure of the damages is a general stipulation made in all cases. After defining the seal-hunting season as extending from June 1st to about the middle of September, the stipulation is to the effect that the average catch per small hunting boat "during the full Bering Sea season," in 1886 and other years named, would have been, for a boat manned by a hunter and two oarsmen, 300 seals; for a boat with a hunter and one oarsman, 200 seals; and for a boat operated by a hunter alone, 100 seals. And it was further stipulated that in 1886 "the net average value to the owner of seal skins was $5.50."

There was no evidence or stipulation at all respecting the probable catch of otter or walrus, or the value of the guns and ammunition seized, so that we have for possible consideration only the matter of the seal skins. But the measure of probable catch provided by the stipulation is designed for an all-time full season hunt. It is incapable of use here, for we have no means of determining what part of the season, or what proportion of the time, it was intended to give, or would have given, to the taking of seal skins.

Moreover, it is elementary that, to recover for the loss of future or anticipated profits, the burden is upon the plaintiff, not only to show the probable gross income, but the probable cost to him of producing it. The difference between the two is the measure of his loss. The anticipated gross product of the plaintiff's voyage would be the seal skins, and it was stipulated only that in hand they were of a net value to the owner of $5.-50 per skin. There was no attempt to show what it would have cost to take them, or generally to show the saving of expense to the owners in case of an abandoned voyage and the return in June of the Sierra to port, as compared with the expense of carrying the voyage through to the middle of September.

We cannot believe that by "net value" in the stipulation was meant value after deducting all expenses of the expedition. That would be net profit, and the distinction in meaning between the two terms is so well known that confusion in use cannot be assumed. The net value to a farmer of a bushel of wheat in his bin is the price upon the market, less the cost of marketing. He may have produced the wheat and put it in the bin at a loss. So the net value to a sealer of seal skins in his hands is the market price for such skins, less the cost of marketing. Illustration of the point may be found in the Whitelaw Case, supra, 9 F.(2d) 103, where there was no stipulation, and it became necessary for the court to work out from the evidence a finding of value and loss. It there appears that the recognized market for seal skins was London, and the net value to the hunter was arrived at by deducting from the market price 10 per cent. to cover cost of transportation, commissions, etc.

No inference opposed to the view we take of the stipulation is to be drawn from the fact that the value found in that case is greatly in excess of the stipulated value here. Upon the other hand, in the light of all the facts, the finding fortifies the construction we have adopted. The records in the several cases before us disclose a rapid rise in the market price of skins from 1886 on. For example, while it is stipulated the net value in 1886 was $5.50, by identical stipulation it is agreed (for example, in cases Nos. 5080 and 5075) that during 1890 the net value was $11.24, and in 1891 $14.23. In the Whitelaw Case, which was for the latter year and involved two classes of skins, the court found that the net value to the hunter, after deducting from the London quotations the 10 per cent. for transportation, commissions, etc., was for one class $14.11, and for the other $14.84. The close correspondence between these values and the stipulated value for that year would seem to establish beyond reasonable doubt that by the stipulation it was intended to state what the skins would bring on the market (or their net value to the owner), less the cost of marketing, and nothing else.

The judgment should be affirmed.

### The Kogler Case—No. 5068

Following a general finding for defendant with the brief comment that "plaintiffs' proof wholly fails," proceedings were had in respect to requested findings and exceptions similar to those in 5067.

[4] Plaintiffs' intestates were the owners of the schooner H. S. Fowler. The vessel cleared from San Francisco, January 21, 1889, with a crew of 16 for "hunting and fishing." No destination was stated. The

shipping articles recite that the vessel was bound "on a hunting voyage in the North Pacific Ocean and elsewhere as the master may direct." The members of the crew were to receive specified shares, payment to be made on delivery of skins to owners. Custom house records at San Francisco show the schooner was entered August 26, 1889, "from hunting and fishing." A map taken from the government files indicates that at the mouth of Unalaska Harbor, facing Bering Sea, on July 19, 1889, the vessel was warned against sealing in the forbidden waters. Maps and charts were introduced to show the habits and migratory period of the seal herd and the seasonable hunting grounds; and it may be stated here that all these maps and charts were introduced in all of the cases, and in all of them there was also testimony upon these general subjects. Incidentally, the testimony tended to show that sealing was carried on in Bering Sea during the season of 1889, despite the warnings and the known opposition of the government. Stipulations were made, identical with those in No. 5067, except that the net value of skins for 1889 was fixed at $7.33. There was no other material evidence, relating either to the question of interference or resulting loss.

Circumstances are perhaps conceivable where the presumption could be reasonably indulged of compliance with a warning and the abandonment of a projected voyage because thereof, but under the conditions here shown it is not thought such a presumption is warranted. The government's policy of forbidding sealing had been in force for a considerable period, and, we must assume, was well known. Apparently it had become the practice to warn all vessels in the Northern Pacific and contiguous waters against sealing, whether they were or were not equipped to hunt, and regardless of their known or apparent intent. For a naval officer to board a vessel and hand the master a copy of the President's proclamation or other formal notice, advising him only of a purpose and policy of which he already had knowledge, would not be likely to have great potency as a deterrent. If there is any basis for it at all, such presumption must rest upon the notion that ordinarily citizens yield obedience to executive orders and regulations issuing from high sources. But admittedly the owners of the H. S. Fowler were not so disposed. In the statement of their claim they they projected a sealing voyage into the Bering Sea, of necessity they disclose an attitude of defiance for all proclamations

24 F.(2d)—59½

and executive orders. Whether they did this in the conviction that they had the right to seal, or in a spirit of lawless adventure, is immaterial; for we are considering only the probable effect of the warning on the course of their voyage, and in either case their mental attitude was such as to preclude the reasonable inference or presumption that, after going to the expense of equipping for and entering upon the voyage, they would abandon it merely because in some formal way they were notified of what they knew when the enterprise was set on foot. And, in fact, it appears from the testimony that sealing was going on in the forbidden waters, regardless of proclamations and warnings. Furthermore, for the reasons stated in the Bird Case, No. 5067, the stipulated net value of the skins is inadequate as a measure of loss or damage.

Judgment affirmed.

### The Ball Case—No. 5069

Involves a voyage of the schooner Active, clearing from San Francisco February 23, 1892, "warned," and nothing more, apparently while in Alitak Bay, Alaska, on June 17, 1892. No evidence, direct or indirect, of the subsequent course of the vessel. At most, the case is no stronger than No. 5068, and the judgment must be affirmed.

### The Woodyard Case—No. 5070

Involves a voyage of the schooner Alice, owners George W. Torrey and William G. Hinton, clearing from the port of Seattle March 8, 1893, "warned" and nothing more on June 13, 1893, apparently at or near port of St. Paul Kodiak. There is no evidence of her subsequent movements, or when she returned from the North Pacific. During the trial it developed that Torrey was not a citizen of the United States at the time the Alice was enrolled and licensed to fish, and that therefore his affidavit made to procure such a license was untruthful. Upon that fact appearing, the cause of action in favor of his estate was voluntarily dismissed, leaving the administrator of the Hinton estate as sole plaintiff. We need not consider the contention, urged by the government, that the whole case must fail upon the theory that the license was fraudulently procured. The court below made a general finding for defendant, with a brief comment, "The evidence utterly fails," and we would not be warranted in disturbing the finding. The evidence is no stronger or more comprehensive than that in the Ball Case, No. 5069.

Judgment is affirmed.

### The Cantillon Case—No. 5071

[5] Involves a voyage of the schooner Willard Ainsworth, licensed March 2, 1892, "for the coasting trade," and clearing from Port Townsend on March 9, 1892, for "hunting and fishing" in the North Pacific Ocean. She was boarded and "warned" by revenue officers at or near Unalaska on May 25, 1892, approximately five weeks before the opening of the Bering Sea sealing season. Her crew consisted of five hunters and ten others, and she carried five hunting boats. The master, Cantillon, called as a witness, testified that after being brought to by a cannon shot the Willard Ainsworth was boarded and warned "to keep out of Bering Sea on penalty of seizure," and because of such warning she proceeded to and hunted in the vicinity of Copper Islands until toward the end of the season, when she ran out of water. There was a stipulation of the probable catch per boat, as in other cases, and also that "in 1892 the net average value to the owner of seal skins was $14.963." There was no testimony or other evidence upon the question of loss or damages. The lower court held without further comment that "in 1892 defendant broke no sealing voyage of the Willard Ainsworth into the Bering Sea. The vessel was licensed for coasting trade, and any sealing was unlawful. Evidence otherwise insufficient." For the reasons explained in No. 5067, the record is thought to be insufficient, in respect to loss, to support a judgment for plaintiff. We, however, think the evidence was sufficient to require a finding of effectual interference with a voyage on the charge of unlawful sealing.

[6] We also think it was error to hold that the schooner could not lawfully seal, because her license was for the "coasting trade." As understood in maritime law and used in the shipping statutes of the United States, apparently the only restrictive significance of the term "coasting" is the exclusion of operations and activities in foreign commerce involving the entry of ports in foreign countries. And the meaning of the word "trade" extends beyond mere barter and sale, or carriage of commodities, and includes any occupation or business of a maritime character. Black's Law Dictionary and cases therein cited. In The Nymph, 18 Fed. Cas. 507 (No. 10388), Judge Story said: "And there is no more difficulty, in propriety of language, in denominating the whale fishery the whale trade, and the cod fishery the cod trade, than in denominating the coasting business the coasting trade." Undoubtedly Congress might, by requiring a license for some special branch of coasting trade or business, withdraw it from the coverage of a general license for the coasting trade. For example, that was done in early years in respect of the whale fishery, the cod fishery, and the mackerel fishery, and accordingly a license for the coasting trade conferred no right to engage in any one of those industries.

But our attention has not been drawn to any provision authorizing or requiring a special license for seal hunting, and therefore it may be lawfully carried on by vessels plying only between or from ports of the United States under a coasting trade license. Support for this view is apparently implied by the Customs Regulations adopted by the United States Treasury. A paragraph of article XXII, headed "Enrollment and License —Coasting Trade," provides: "Such vessels only as are engaged in catching cod or mackerel should be licensed for the fisheries. Vessels engaged in catching other kinds of fish should be licensed for the coasting trade." The implication is that, except where a special license is required, a coasting trade license covers all maritime business, exclusive only of that which is to be classified as foreign trade, as involving the entry of foreign ports.

I am therefore of the opinion that the judgment should be affirmed upon the ground only of the insufficiency of the evidence respecting loss.

### The Decker Case—No. 5072

Involves a voyage of the schooner Willard Ainsworth in 1893. The record is in all material respects closely analogous to that in No. 5071, and for the reasons there assigned the judgment should be affirmed.

### The Bangs Case—No. 5073

Involves a voyage of the schooner Felitz in 1891. In substance the record is the same as that in No. 5071, and for the reasons there assigned the judgment should be affirmed.

### The Lindeman Case—No. 5074

Involves a voyage of the schooner Anaconda in 1892. It is like No. 5071, and for the reasons there assigned the judgment should be affirmed.

### The Pacific Hunting & Fishing Company Case—No. 5075

Involves a voyage of the schooner Bessie Rutter in 1891. If, in addition to the showing made by official records, we accept the testimony of one Spexarth, managing own-

er, for the corporation, of the schooner, the plaintiff was organized for the purpose of carrying on the business of seal hunting, and built the schooner for that purpose. She was not suitable for and never engaged in other trade. She cleared from Astoria March 17, 1891, for a sealing expedition in the Bering Sea; at least, such were the instructions of the owner to the master. She carried a crew of 14 and four hunting boats, and was provisioned and otherwise equipped for sealing. In the crew were 4 hunters. The President issued a proclamation against sealing in Bering Sea, on June 15, 1891 (27 Stat. 980). Thereafter, on June 29, 1891, and before she reached Bering Sea, the schooner was boarded by naval officers, who delivered to the master a copy of the proclamation, together with "warnings." She did not go into Bering Sea, and returned to port in July. There was no contradictory evidence, and nothing to impeach Spexarth.

We think a finding of a voyage to Bering Sea effectually interfered with by defendant upon a sealing charge. could not be reasonably refused. The evidence of damage or loss, however, consisted only of the stipulations already referred to, and upon that ground alone the judgment should be affirmed.

### The Christiansen Case—No. 5076

The complaint exhibits three causes of action for voyages of the schooner Albert Walker in 1891, 1892, and 1893; owners, Julius and Lawrence Christiansen. Lawrence Christiansen was not a citizen, and in that respect the record is like that in No. 5070, enrollment having been secured upon the untrue affidavit of Julius that both owners were citizens. The lower court apparently regarded the circumstance material only as affecting the weight of the testimony of Julius, who was the principal witness. The third cause of action, involving the alleged voyage of 1893, was wholly abandoned, as were the claims of Lawrence for the other two voyages. By the court below the evidence was discussed at some length in a written memorandum, and upon consideration we cannot properly say that the refusal to find that the owner ever intended to seal in the Bering Sea, or that a voyage to the forbidden waters for sealing was broken up, was unreasonable, and, in so far as appears, no erroneous rule of law was applied.

Upon the question of loss or damage, the record is identical with the records we have already discussed. Accordingly the judgment is affirmed.

### The Landes Case—No. 5077

Involves a voyage of the schooner Mist in 1891, clearing from Port Townsend May 26, 1891, as appears in the records of the customs house, "for the North Pacific Ocean for a hunting and sealing voyage." Her license, however, issued on the same day, was for "carrying on the fishing trade."

Henry Landes, the owner, deposed that: "In 1891 I was using said schooner for fur sealing and hunting on the west coast of North America, and in the Bering Sea if permitted to do so by the government." He further stated that she carried two boats and two hunters, and was provisioned and otherwise equipped for that purpose. Upon clearing, he stated, "her destination was the North Pacific Ocean for her spring catch, and then the summer grounds off the Pribiloff Islands seal herd, unless prevented by the United States government." Entries in official records show that on July 8, 1891, at Unalaska, the schooner was boarded by naval officers, who handed the master a copy of the President's proclamation and written warning to leave Bering Sea.

That is the extent of the material proofs respecting the voyage, and the record contains no evidence whatsoever touching the course of the Mist after she was "warned," or when she returned to port. The finding of the court below was simply "that the defendant did not break the Mist's sealing voyage in 1891, as alleged in the complaint," and we cannot say that the declination to find affirmatively to the contrary was unreasonable. Some significance could by the court be attached to the failure of the owner to testify respecting the course of the schooner after "warning," or when she returned to port.

And it is further to be noted that the license was only for the "fishing trade." How the hunting of fur-bearing seals can with propriety be referred to as fishing we cannot understand. But if doubt there be, upon referring to Customs Regulations, article XXII, quoted in part, supra, in No. 5071, it is to be observed that in practice only vessels engaged in catching cod and mackerel are "licensed for the fisheries, and vessels engaged in catching other kinds of fish should be licensed for the coasting trade." And, as we have seen, to support the validity of a sealing voyage in each of the six cases where the license was for the "coasting trade" only, counsel, invoking this customs regulation, have urged the contention accepted by us that a "coasting license" is the

proper and only proper license for a sealing expedition.

The judgment must be affirmed upon these grounds, as well as for the deficiency of proof on the question of loss, as in other cases.

### The Woodyard Case—No. 5078

Involves three voyages of the schooner George R. White, one in 1891, one in 1892, and the third in 1893, with corresponding counts in the complaint. The lower court's very brief "findings of fact and opinion" was "that defendant did not break any lawful sealing voyage of the George R. White, said vessel being licensed for the year involved in the coasting trade." In No. 5071, we have held the view thus implied to be erroneous. Following the filing of this memorandum, and before judgment, the court was requested to find, under each cause of action, that the schooner was "bound on a hunting voyage for fur seal in the * * * Bering Sea," and the request was denied. There was also a declination to find that "defendant wrongfully and unlawfully interfered with said sealing voyage of the said schooner."

Whether this refusal was due to the coasting trade license consideration, or was because the court was not convinced of interference in fact, does not appear. The evidence to support both requests is meager. It is shown that the Schooner cleared from Seattle for the "North Pacific Ocean" February 17, 1891, and re-entered that port on August 5, 1891, the crew consisting of 11 men besides the master. She carried four two-men boats, and was otherwise provisioned and equipped. On June 29, 1891, in Popoff Straits, she was boarded by a naval officer, who delivered to the master a copy of the President's proclamation of June 15, 1891, together with warnings respecting seal hunting. She was seen hunting during the season, but where the witness who gave the testimony does not state. There is no other material evidence respecting the voyage of 1891.

In 1892 she cleared from Port Townsend for the "North Pacific Ocean" on January 19, and on June 7, 1892, according to official records, she was spoken by the "United States steamer Adams" near Unalaska. The only other evidence is given by one of her hunters, and from his testimony it appears that she carried four hunting boats and a stern boat, and was otherwise equipped for sealing; that she was boarded twice during the season by naval officers, once, apparently, on June 7, and again on June 15, the officer in each case being from the "United States steamer Adams." She did not enter the Bering Sea because, as the witness was informed by the master, of "orders from the war ships." She hunted during part of the season about Copper Islands, and it does not appear when she returned to port.

In 1893, clearance was on March 13, from Port Townsend, for the "North Pacific Ocean." On June 11 the schooner was boarded and "warned" about two miles south of Two-Headed Cape, and again on June 16 she was boarded and "warned" somewhere "at sea." She was equipped for sealing, and was observed actually so engaged in Fair Weather Grounds. There was no evidence of the course of the schooner or her activities during the season, or when she returned to port. In short, the foregoing is in substance all the evidence relating to the subjects of the requested findings.

In the most favorable view to plaintiffs, it can be said only that the record might warrant the requested findings if the court had made them, but clearly we cannot say that it was so conclusive as to require them. The stipulations respecting loss or damage are identical with those in other cases. Judgment affirmed.

### The Hibbard Case—No. 5079

Involves the voyage of the schooner Volunteer in 1893. In point of clearance, license, testimony of part owner, failure to produce testimony or other evidence respecting movement of vessel after "warning," and in all other material respects, the case made is strikingly similar to that in the Landes Case, No. 5077, and for the reasons there given the judgment is affirmed.

### The Ladd Case—No. 5080

[7] Involves a voyage of the schooner Lilly L in 1890, clearing from San Francisco January 18, 1890, "for a hunting and fishing voyage," no destination stated, with a crew of 22 besides the master. Shipping articles are of the same date for the same crew, 6 of whom are stated to be hunters, "bound from San Francisco on a hunting and fishing voyage for a period of 12 calendar months," no destination given. Following the phrase "on a hunting and fishing voyage," there were originally the words "voyage after fur seal, seal otter, etc.," but these were stricken out. On official map received in evidence, it is shown that the schooner had been seized in Bering Sea in a former year, namely, in July, 1887, and again "warned" on July 4, 1889, but the exhibit does not show either seizure or "warning" in 1890. The only testimony respecting

the voyage was given by Milton F. Scott, one of the hunters.

In summing up a short discussion of the record, the lower court said: "In view of all the facts and circumstances, the hypothesis that in 1890 the owners intended and embarked upon a voyage elsewhere than in Bering Sea is as reasonable as otherwise. If her master could have extended her voyage to said sea, the evidence that he had so decided fails. Any such inference would be surmise or guess, from vague and ambiguous evidence, and no loss appears." We cannot say that this view is unreasonable, and the only evidence of loss is stipulation as in other cases. Judgment affirmed.

### The Bird Case—No. 5081

Involves a voyage of the schooner Sylvia Handy in 1889, clearing from San Francisco February 2, 1889, "for a hunting and fishing voyage." From shipping articles it appears the schooner carried a crew of 22, 4 of whom were hunters, and was "bound from the port of San Francisco on a sealing and trading voyage to the North Pacific and Arctic Oceans, or elsewhere as the master may direct." Official map of the government, showing positions of all sealing vessels seized or warned during the seasons of 1886, 1887, and 1889, introduced and relied upon by plaintiffs in the several cases to prove such facts, does not indicate any seizure or warning of this schooner in the year 1889. Two of the hunters gave testimony to the effect, among other things, that before the schooner left the vicinity of San Francisco they went aboard the revenue cutter Corwin and were there told they could not hunt seal in Bering Sea, and that thereafter they did "not intend to go into Bering Sea. We intended to hunt on the coast." Pursuant to this intention, apparently, they did sail and seal along the coast as far north as Sandpoint, near Bering Sea. Under all the circumstances, we cannot say that it was unreasonable for the lower court to adopt the view that "defendant did not break the Sylvia Handy's sealing voyage in 1889."

The case, it may be added, strikingly illustrates the inadequacy of the stipulations, which were the same here as in other cases, to furnish a basis for a finding of damages. If it were to be inferred that at the outset, while the schooner was still in San Francisco, a sealing voyage to the Bering Sea was contemplated and the schooner was equipped for that purpose, the "interference," if any there ever was, was complete before she left the vicinity of San Francisco. She could then have put back to port, and manifestly her damage would not have been the market value of her prospective catch, less only the cost of marketing, but deduction would also have to be made of the additional expense of actually making the projected voyage, had such voyage not been abandoned. Judgment affirmed.

### The Ladd Case—No. 5082

Involves voyages of the schooner Emma and Louisa in 1891 and 1893. Clearance for the first voyage was made March 10, 1891, and for the second December 20, 1892, both from San Francisco, and both for hunting and fishing, without naming destination. In the shipping articles the only destination given was "in the Pacific Ocean and elsewhere as the master may direct."

It is shown that on June 15, 1891, an agreement of co-operation in preventing sealing in the Bering Sea was entered into between the British and American governments, by which each was authorized to warn and seize sealing vessels of the other. According to the testimony of one of the hunters, the Emma and Louisa was in the Bering Sea from about June 1, 1891, until the end of September, engaged in sealing. However, after being so engaged eight or ten days, they were hailed by a British cutter and were told to "get out." Thereupon they sailed west about 150 miles to get out of the "cutter's road," and stayed there the balance of the season, but found sealing very poor, as compared with that of the place where they were so engaged when "warned."

We think there was interference, and that the defendant is chargeable therewith, though the warning was given by a British vessel; but not only are the stipulations, which are like those in other cases, inadequate as to damage, but the evidence is so meager touching probable loss of catch due to the interference as to be doubtfully sufficient to warrant any finding upon that subject, had the lower court attempted to make one.

As to the voyage of 1893, the same witness, a hunter for that year, also testified touching the course of the schooner and his understanding of the reasons therefor. We cannot say that the declination of the lower court to infer a projected voyage to Bering Sea and that it was interfered with by defendant was arbitrary. It is to be inferred from the memorandum decision that the court felt that some of the testimony was given under the stimulus of highly leading questions, and that is always a material consideration in weighing testimony and giving to it just significance. Judgment affirmed.

### The Case of Martinez—No. 5083

Involves a voyage of the schooner Rose Sparks in 1892, clearing from San Francisco March 17, 1892, with crew of 14, "for a hunting and fishing voyage," no destination stated. In shipping articles the agreement is. "to make a fishing and hunting voyage from port of San Francisco to North Pacific and Arctic Oceans, or elsewhere as the master may direct." The log of revenue cutter Corwin shows that at Alitak Bay, on June 15, 1892, officers boarded the schooner and "warned" her; she had also been "warned" on June 8 by the Mohican. The only other evidence upon the character, purpose, and destination of the voyage and the subject of interference is to be found in the deposition of A. C. Simons, a hunter of the crew. The schooner, he stated, was provisioned and equipped for hunting seal. Though the clearance is silent as to destination, and despite the agreement in the articles, he deposed that clearance was for "the North Pacific Ocean and Bering Sea." From him we learn that the Mohican's warning was given at Middleton Island, on the Alaskan coast, the notice being to the effect that the schooner should not enter the Bering Sea for sealing under pain of seizure. The schooner thereafter hunted as far as the "Pass" and came home, but when the witness does not state. The captain of the Yorktown or of the Corwin searched the schooner at Alitak Bay, and said to the master that he had already been warned against sealing in the Bering Sea, and further warning was unnecessary. On cross-examination, the witness stated that he had nothing to do with the directing of the schooner's course, and that it would take two or three days to go to Bering Sea from Middleton Island, where a copy of the President's proclamation was given the master by the Mohican. The officers of the cutter then stated that the schooner would not be permitted to seal in Bering Sea, and that all vessels going there for that purpose would be seized.

It is quite impossible to say that the owners were ignorant of the government's policy of preventing sealing in the Bering Sea at the time they equipped the Rose Sparks and embarked upon the voyage; it had become a settled policy and was notorious. If. that be true, how can it be said that these "warnings" added anything, or in themselves constituted interference with an open voyage in the Pacific Ocean, never declared to be destined for the Bering Sea? There is no evidence when the vessel returned to port, and no evidence of why she did not go into Bering Sea, other than that of this member of the crew, who admittedly had no voice in directing her course. We are unable to say that the court's adverse finding was against the law.

Stipulations as to probable loss are the same as in other cases. Judgment is affirmed.

### The Ladd Case—No. 5084

Involves a voyage of the schooner Lilly L in 1893, clearing from San Francisco on January 17, 1893, with a crew of 22, "for a hunting and fishing voyage," no destination stated. Shipping articles of same date recite only that the schooner "was bound * * * for a hunting and fishing voyage in the Pacific Ocean, or elsewhere as the master may direct."

This is the same vessel, with the same owner, as in the voyage of 1890, No. 5080, supra, and 1891, No. 5082, supra, and manifestly the owner was entirely familiar with the government's attitude respecting sealing in Bering Sea, and in the absence of an affirmative showing it is scarcely to be presumed that he purposed to do this year what he has contended she refrained from doing in previous years because of notice of such attitude. The only testimony on the specific voyage was given by one Fuedner, a hunter in the crew. He said he had no knowledge where the vessel was to go when she shipped; they lingered on the Cordell Banks about 15 days, then went to the Hawaiian Islands and on the coast of Japan, where they sealed during the spring, reaching Hakodate about the 1st of June. There, from different members of the assembled sealing fleet, he learned of the President's proclamation against sealing in Bering Sea. He then talked with the captain of the Lilly L at the latter's hotel, and was informed by him that he had received notice from the agents respecting the proclamation. Thereupon, in response to a leading question, he stated, "It was our intention to enter Bering Sea," but admitted he had absolutely nothing to say about where the vessel was to go. So far as he knew, there was nothing, other than the proclamation, in the nature of interference, and he did not know, by hearsay or otherwise, what effect that had upon either the master or the owner.

The entire deposition is not before us, and the lower court characterized the testimony as being given, in part, in response to "grossly leading questions, at times equivalent to directions." But, if we give effect to what are little more than incompetent conclusions, the most that can be said in respect to sealing

in Bering Sea is that, when the voyage was projected, and thereafter, the purpose of the owners and of the captain was to seal in the Pacific Ocean, and not in Bering Sea, unless permission was granted so to do. We think the finding against a broken voyage was clearly right. Stipulations respecting damage or loss same as in other cases. Judgment affirmed.

### The Cohn Case—No. 5085

Involves a voyage of the schooner Louis. Olsen in 1892, clearing from San Francisco February 3, 1892. The voyage was a roving one, like that involved in the next preceding case, No. 5084, and the record is in material respects so similar that a detailed statement is thought to be unnecessary. Judgment affirmed.

### The Tripp Case—No. 5086

Involves a voyage of the schooner Mary Brown in 1893, clearing from San Francisco January 11, 1893, for hunting and fishing, without destination. The record in some respects is closely analogous to that in No. 5084. Going over to the Japan coast, the schooner sealed there until early in June, and then put into port at Hakodate about the middle of June. There the only witness, one of the crew, testified they saw some posted notices against sealing in Bering Sea, under pain of being seized. They spent three days there, then hunted a few days around Achisa, but concluded the sealing was too poor, and went to Victoria, where the crew was paid off. He further testified that, when they left Hakodate, they intended, notwithstanding the notices they saw there, to go into Bering Sea, but changed their minds later.

We cannot say that the adverse finding of the lower court was arbitrary. The case again illustrates in a striking way the inadequacy of the stipulations touching loss or damages, which are the same here as in other cases. Judgment affirmed.

### The Goff Case—No. 5087

Involves a voyage of the schooner San Diego in 1893, clearing from San Francisco January 16, 1893, with a crew of 14, "for hunting and fishing," and returning to port September 4, 1893. The articles were for such a voyage "to the North Pacific and Arctic Oceans, or elsewhere, as the captain may direct," and further provided: "In case schooner is lost or seized, the master and owner thereof are not to be held responsible for the wages or lays of crew." Two witnesses testified respecting the voyage, and in the comment made by the court below it is said

the witnesses were evasive, and "leading questions and conclusions are prominent." The record, as we have it, though in condensed form, tends to support this statement. Upon the whole, the case is similar to No. 5084, supra, and, to say the least, no stronger. Judgment affirmed.

### The Nielsen Case—No. 5088

Involves a voyage of the schooner Rattler in 1893, clearing from Gloucester, Mass., in November, 1892. The voyage is connected with that of the San Diego, No. 5087, supra, and the records in the two cases are so nearly identical that we refrain from detailed discussion. Judgment affirmed.

### The Caughell Case—No. 5089

Involves a voyage of the schooner San Jose in 1888, clearing from San Francisco June 27, 1888, "for a hunting voyage," destination not stated, crew of 13, or possibly 16, including 4 hunters, and otherwise equipped and provisioned. Under the shipping articles, the vessel was bound "on a hunting voyage to the North Pacific Ocean and elsewhere as the master may direct." John Caughell, one of the hunters and also a part owner, gave testimony. After clearing, he said, "we went north, hunting seal as we went, and we went to Sandpoint for information from Bering Sea and one thing and another." From something posted there, and from what some one told them, they concluded the Bering Sea was "closed," and they did not enter it. There was no boarding or "warning" by any naval officers, and no "interference," other than such as is implied by the posted notice and more or less general information current at Sandpoint. Referring to the time he signed up as a hunter, the witness was asked the following questions, to which he gave the attendant answers:

"Q. Then your engagement was to go wherever the master might direct? A. Just so.

"Q. Then you also knew, when you shipped, did you not, that the Bering Sea might be closed to sealers? A. Sure.

"Q. You had no knowledge, when you left, that the Bering Sea was closed to sealers that year, had you? A. No; I had no knowledge whatever."

While, in the light of all the circumstances, we think the evidence might support a contrary view, we cannot say that it was so conclusive as to render arbitrary the court's finding that "it seems likely the owners knew defendant's opposition to sealing in Bering

Sea, and so did not intend, equip, begin a sealing voyage thereto."

Stipulations as to loss same as in other cases. Judgment affirmed.

## The Norton Case—No. 5090

This case involves two voyages of the schooner Henry Dennis, the first cause of action being for 1889 and the second for 1890. John Worth, sailing master for the schooner during both seasons, gave testimony, in some respects corroborated by the official records, which, if credited, proves voyage and effectual interference on charges of unlawful sealing. There was no contradictory testimony or impeaching circumstances, and we do not think the testimony could properly be rejected or discredited.

The schooner had a coasting trade license for each voyage, but that defense we have ruled adversely to the defendant in No. 5070, supra. The question of loss or damage is covered only by stipulations similar to those in other cases. Accordingly, upon that ground alone, judgment should be affirmed.

GILBERT and RUDKIN, Circuit Judges (concurring in part). [8] Judge DIETRICH finds that there was no interference in certain of these cases, that there was interference in certain other cases, and that in all cases the proof of damages was insufficient. We concur in these findings and conclusions, and also concur in the opinions where no interference was found. But in the remaining cases a new trial should be granted. The first and principal question in each case was that of interference, and, if that issue was found against the plaintiff, any inquiry into the incidental question of damages became wholly immaterial. Of course, we do not deny to the court below the right to base its decision on both grounds, but in so doing prejudice resulted to the several plaintiffs; for, had the court below correctly decided that there was unlawful interference, as found by Judge DIETRICH, then the court might, and we think should, in the exercise of a sound judicial discretion, either open the case for further testimony on the question of damages or grant a new trial of that issue. But, having erroneously found that there was no right of action in any event, the court could not consistently, and doubtless would not, go through the idle formality of taking testimony on an immaterial issue. We are not asked to reverse a judgment free from error, but are simply called upon to determine whether an admitted error was prejudicial to the parties complaining. And,

while the testimony was insufficient to enable the court to fix definitely the amount of damages, we think that substantial damages were shown, and that an affirmance of the judgments would result in a miscarriage of justice.

For these reasons, we concur in the opinions in the following cases: Kogler, No. 5068; Ball, 5069; Woodyard, 5070; Christiansen, 5076; Landes, 5077; Woodyard, 5078; Hibbard, 5079; Ladd, 5080; Bird, 5081; Ladd, 5082; Martinez, 5083; Ladd, 5084; Cohn, 5085; Tripp, 5086; Goff, 5087; Nielson, 5088, and Caughell, 5089. In the remaining cases, namely, Bird, No. 5067; Cantillon, 5071; Decker, 5072; Bangs, 5073; Lindeman, 5074; Pacific Hunting & Fishing Co., 5075; and Norton, 5090—the judgments are reversed, and the causes are remanded for a new trial.