## PACIFIC HUNTING & FISHING CO. v. UNITED STATES.

Circuit Court of Appeals, Ninth Circuit.
June 17, 1929.

No. 5745.

J. N. Gillett and H. H. North, both of San Francisco, Cal., for appellant.

Geo. J. Hatfield, U. S. Atty., and Esther B. Phillips, Asst. U. S. Atty., both of San Francisco, Cal.

Before RUDKIN, DIETRICH, and WILBUR, Circuit Judges.

DIETRICH, Circuit Judge. This is one of the "Sealing Cases" which upon a former appeal was reversed and remanded for a new trial. Bird et al. v. United States (C. C. A.) 24 F.(2d) 933, 938, 944. The damage claimed is for interference by the United States with an alleged sealing voyage of the schooner Bessie Rutter to the Bering Sea in 1891. Upon the second trial a jury was again waived, and, after consideration of the evidence, the court found that, though on June 29, 1891, when the schooner was in the North Pacific Ocean, officers of the United States vessel Thetis boarded her and warned her against sealing in the Bering Sea, no "interference" in the statutory sense was shown, for the reason that at no time during that year did she engage in or undertake a voyage to the Bering Sea for the hunting of seals, and accordingly there was a judgment of dismissal. The single question is of the propriety of this latter finding.

Upon the former appeal, in construing the statute, we said: " 'Voyage,' as used in the Act, imports an actual voyage, as distinguished from one existing only in desire, or which might possibly or probably have been undertaken, but for the well-known opposition of the officers of the government. There must have been interference with a specific voyage, in progress, with the matured purpose of sealing in the designated waters, and the interference must have been on account of or on a charge of such purpose, which was then claimed to be unlawful." And of the effect of the trial court's findings we said: "The scope of our review upon this primary question whether or not there was in fact effectual interference is necessarily within narrow compass. Plaintiffs have the burden of proof, and as the trier of issues of fact the function of the judge was like that of a jury. His findings we cannot disturb, unless they are held to be so clearly against the evidence as to be unwarranted as a matter of law. The evidence cannot be said to be conflicting, but it is extremely meager. To reach the ultimate conclusion desired by plaintiffs, it was necessary to draw inferences, and within the range of reason what deductions were to be made from probative facts was a matter for the trial judge."

Applying these rules, we are of the opinion that we would not be warranted in disturbing the finding complained of. Against it is the testimony of Spexarth, one of plaintiff's stockholders, to the effect that the schooner was adapted for sealing, that in the spring of 1891 she was fitted out for a sealing expedition to the Bering Sea, and that he (the witness) directed her master, Capt. Olsen, to proceed from Astoria to the northern waters for that purpose. But the witness himself did not go on the voyage and had no personal knowledge of what occurred after the vessel left in March until she returned to Astoria in July. He is a deeply interested witness, and after the lapse of thirty-five years, apparently without the aid of any records, testified to a purpose and an alleged oral instruction entertained and given more than three months before the opening of the Bering Sea sealing season. Such records as were available, the government, and not the plaintiff, offered in evidence. If it be said that the fact that the schooner was adapted to sealing and in the spring of 1891 was suit-

ably equipped for a sealing voyage tended to corroborate Spexarth's testimony, it is also true she was adapted for fishing, and that sealing was being prosecuted in waters other than the Bering Sea. Moreover there are opposing circumstances, inferences, and probabilities. The Bessie Rutter had made no sealing voyage to the Bering Sea. She had recently been built or purchased by the plaintiff, and, with the knowledge which it must have had of the notorious and apparently settled policy of the government to prevent sealing in the Bering Sea, it is improbable, to say the least, that it would have made the investment for the purpose of engaging solely in an enterprise generally thought to be unlawful and for that reason recognized as being highly hazardous. By stipulation it was shown that the sealing season in the Bering Sea did not open until about July 1st of each year, but the schooner cleared from Astoria and entered upon such voyage as she intended to make on March 17, three and a half months before she could expect to seal in the forbidden waters. From an expert witness produced by plaintiff we get the information that during the period of the sealing controversy, including 1891, it was customary for vessels that cared to hunt in the Bering Sea, simply to "clear for hunting and fishing" without stating any destination, but upon this voyage the Bessie Rutter cleared, of record, not for hunting or fishing, but for the destination of Sand Point, Alaska. Apparently she sealed in other waters, for by her records it is shown that on June 30 she had in cargo 207 seal skins. Just when she entered at Sand Point is not shown, but on July 1st she cleared at that port with permission to proceed to Yokohama, and upon July 20th she entered, upon her return, at the port of Astoria. The fact that she was warned has little significance, for it seems to have been the practice for the government to warn all vessels in North Pacific waters.

The record is not unlike that of other cases considered in Bird v. United States, supra, and particularly of the three Ladd Cases, 24 F.(2d) 940, 941, 942, and of the Cohn Case, page 943. Pertinent we think is the comment made in the Ladd Case, No. 5084, where we said: "But, if we give effect to what are little more than incompetent conclusions, the most that can be said in respect to sealing in Bering Sea is that, when the voyage was projected, and thereafter, the purpose of the owners and of the captain was to seal in the Pacific Ocean, and not in Bering Sea, unless permission was granted so to do."

Affirmed.